**Adela Chiminya TACHIONA, et al., Plaintiffs,**

v.

**Robert Gabriel MUGABE, Zimbabwe African National Union Patriotic Front, Stan Mudenge, et al. Defendants.**

**No. 00 CIV. 6666(VM).**

United States District Court, S.D. New York.

Dec. 11, 2002.

Paul Sweeney, Hogan & Hartson, L.L.P., New York City, Theodore M. Cooperstein, Theodore M. Cooperstein, P.C., Washington, DC, for Plaintiffs.

### DECISION AND ORDER

MARRERO, District Judge.

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | BACKGROUND | 405 |
| II. | DISCUSSION | 406 |
| | A. LIMITATIONS OF CHOICE OF LAW | 406 |

 B. EMERGENCE OF FEDERAL COMMON LAW POST–FILARTIGA........418
 C. CHOICE OF LAW ANALYSIS AND APPLICATION OF THE
 PERTINENT RULES OF DECISION ...............................420
 1. Torture and Extrajudicial Killing ...............................420
 a. Tapfuma Chiminya Tachiona ...................................420
 b. David Yendall Stevens .......................................421
 c. Metthew Pfebve ............................................421
 2. Denial of Political Rights......................................423
 a. The Restatement of Foreign Relations ..........................426
 b. The Civil and Political Rights Covenant ........................427
 c. Recognition by Court and Other Adjudicatory Bodies ...............430
 d. Application to the Case At Bar ................................432
 e. Zimbabwe Law ...........................................434
 3. Cruel, Inhuman or Degrading Treatment ........................435
 a. International Law..........................................435
 b. Zimbabwe Law ...........................................438
 4. Racial Discrimination and Unlawful Seizure of Property.................439
 a. Racial Discrimination.......................................439
 b. Seizure of Property ........................................440

III. CONCLUSION .......................................................441
 A. CLAIMS ONE AND TWO ..........................................441
 1. Extrajudicial Killing...........................................441
 2. Torture.....................................................441
 B. CLAIMS THREE AND FOUR .......................................441
 1. Loss of Enjoyment of Political Rights ............................441
 2. Loss of Property..............................................441
 C. CLAIM FIVE .......................................................441
 D. CLAIMS SIX AND SEVEN .........................................442
 1. Systematic Racial Discrimination ...............................442
 2. Loss Home, Destruction of Business and Seizure of Property ............442

IV. ORDER .............................................................442

## I. BACKGROUND

Plaintiffs in this matter, all citizens of Zimbabwe, brought suit alleging violations of the Alien Tort Claims Act (the "ATCA"),[1] the Torture Victim Protection Act (the "TVPA")[2], fundamental norms of international human rights law, and Zimbabwe law. In a Decision and Order dated October 30, 2001, the Court dismissed on jurisdictional grounds Plaintiffs' claims naming as defendants Zimbabwe President Robert Mugabe ("Mugabe") and other Zimbabwe government officials entitled to invoke sovereign or diplomatic immunity. But the Court found a sufficient basis to exercise jurisdiction over the claims asserted against the Zimbabwe African National Union–Patriotic Front "ZANU–PF," the country's ruling party, through process personally served on Mugabe, who is also ZANU–PF's titular head.[3]

---

**1.** *See* 28 U.S.C. § 1350.

**2.** *See* Pub.L. No. 102–256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 Note).

**3.** *See Tachiona v. Mugabe,* 169 F.Supp.2d 259 (S.D.N.Y.2001) (*"Tachiona I "*). The United States (the "Government"), which had filed a Suggestion of Immunity on behalf of Mugabe, moved for reconsideration, arguing that the Court's exercise of jurisdiction over ZANU–PF grounded on personal service on Mugabe was impermissible under federal law and international principles governing sovereign and diplomatic immunity that the Government suggested applied to Mugabe. The Court denied the Government's motion. *See Tachiona v. Mugabe,* 186 F.Supp.2d 383 (S.D.N.Y.2002) (*"Tachiona II "*).

ZANU–PF failed to answer the complaint or otherwise appear in the case and a default judgment was entered against it. The Court then referred the matter to Magistrate Judge James C. Francis, IV for an inquest on damages. ZANU–PF did not appear in that proceeding as well. Consequently, the Magistrate Judge issued a Report and Recommendation on July 1, 2002 (the "Report") recommending awards of damages on Plaintiffs' claims under both the ATCA and the TVPA. The Court, in a Decision and Order dated August 7, 2002, adopted the Report's factual findings and determination of damages relating to the torture and extrajudicial killing claims under the TVPA, but reserved judgment as to the award recommended under the ATCA.[4]

With regard to the ATCA claims, the Court determined that under its reading of applicable Second Circuit doctrine, as articulated in *Filartiga v. Pena–Irala*,[5] it was required to perform a choice of law analysis to determine the appropriate substantive law governing the adjudication of ATCA disputes alleging human rights abuses.[6] The Second Circuit recently reiterated this approach. In dictum in *Wiwa v. Royal Dutch Petroleum Co.*,[7] the court construed *Filartiga I* to hold that the "ATCA establishes cause of action for violations of international law but requiring the district court to perform a traditional choice-of-law analysis to determine whether international law, law of forum state, or law of state where events occurred should provide substantive law in such an action."

Because the choice of law question had not been addressed in prior proceedings on this matter, the Court directed the parties to brief the issue. Plaintiffs submitted a timely response. ZANU–PF did not respond. Consequently, the Court regards Plaintiffs' factual assertions, and the materials describing the content and meaning of Zimbabwe law as it pertains to the proceeding now before the Court, as unrefuted and accords them appropriate weight.

Noting that each of the seven ATCA claims they assert describes conduct that violates substantive rights recognized by the Zimbabwe Constitution and applicable municipal laws, Plaintiffs urge the Court to approve the corresponding award of damages recommended by the Report. For the reasons described below, the Court adopts the recommendations of the Report with one modification.

## II. *DISCUSSION*

### A. *LIMITATIONS OF CHOICE OF LAW*

Plaintiffs contend that the Court's ATCA choice of law inquiry should focus on the existence of substantive rights violated by particular unlawful conduct and not on whether the law of the state where the alleged deprivation occurred recognizes specific causes of action defining those rights and prescribes particular remedies for their violation.

Before undertaking the choice of law analysis *Filartiga I* instructs, the Court is obliged, as a context for its ruling, to express some conceptual challenges and practical constraints the task inherently presents. At the outset, a central question raised by the endeavor is the purpose the choice of law findings are to serve. Does

---

**4.** See *Tachiona v. Mugabe*, 216 F.Supp.2d 262 (S.D.N.Y.2002) (*"Tachiona III"*).

**5.** 630 F.2d 876 (2d Cir.1980) (*"Filartiga I"*).

**6.** See *Tachiona III*, 216 F.Supp.2d at 268–69.

**7.** 226 F.3d 88, 105 n. 12 (2d Cir.2000), *cert. denied*, 532 U.S. 941, 121 S.Ct. 1402, 149 L.Ed.2d 345 (2001).

the analysis compel the application of one forum's pertinent law in its entirety? Or is it to be employed, as Plaintiffs suggest, for comparative ends, to identify various sources of relevant substantive rights and principles from which the Court may draw in fashioning the ATCA remedy most appropriate under the circumstances of the case?

■ Ordinarily, a choice of law assessment weighs the competing interests of the different jurisdictions that may have significant contacts and relationships with a given legal dispute and substantial stakes in the outcome. The task presupposes that in considering the various claims for application of one forum's decisional rules as opposed to another's, the substantive local law applied would be that of the jurisdiction which, in the final analysis, possesses the most significant relationships with the parties and the events and thus the most extensive interests in the outcome of the litigation.[8] Consequently, the governing rules the inquiry would compel would encompass the entire body of local law that normally would be brought to bear domestically to fully resolve the merits of the controversy were it litigated in that jurisdiction.[9]

■ Under strict obedience to these choice of law doctrines, courts may not disregard applicable municipal law that the analysis points to as the substantive deci-

sional rule, and instead pick and choose from among other doctrinal sources to tailor a remedy specific to the occasion. As the Supreme Court has observed: "The purpose of a conflict-of-laws doctrine is to assure that a case will be treated [in] the same way under the appropriate law regardless of the fortuitous circumstances which often determine the forum."[10]

The adoption of these principles as the product of a choice of law evaluation of an ATCA claim poses a significant quandary. In some cases the relevant municipal law of the jurisdiction where the events occurred and where the parties reside, and thus whose application may be demanded under traditional choice of law precepts, may be inadequate or may conflict with federal principles embodied in the ATCA, or with international norms. In consequence, circumstances may arise, as in the instant case, in which rigid adherence to that local law may defeat the purposes of the ATCA.[11]

The rub here arises because a strict reading of *Filartiga I* may suggest the possibility of such an outcome. In pointing to the distinction between the ATCA jurisdictional threshold, which requires consideration of international law, and the question of the substantive law to be applied to determine liability, the Second Circuit indicated that the choice of law inquiry is "a much broader one, primarily

**8.** See Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279, 284 (1963); Restatement (Second) of Conflict of Laws (1971) § 6 cmt. f. ("In general, it is fitting that the state whose interests are most deeply affected should have its local law applied.").

**9.** See Restatement (Second) of Conflict of Laws, supra § 6 cmt. f; see also Richards v. United States, 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962) (holding that under the Federal Tort Claims Act the reference to "law" is to "the whole law of the State where

the act or omission occurred," including its choice of law rules).

**10.** Lauritzen v. Larsen, 345 U.S. 571, 591, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); see also Richards, 369 U.S. at 13–14, 82 S.Ct. 585.

**11.** See, e.g., Filartiga v. Pena–Irala, 577 F.Supp. 860, 863 (E.D.N.Y.1984)("Filartiga II"),; Xuncax v. Gramajo, 886 F.Supp. 162, 189–91 (D.Mass.1995); Forti v. Suarez–Mason, 672 F.Supp. 1531, 1547–48 (N.D.Cal. 1987) ("Forti I").

concerned with fairness."[12] The Circuit Court then intimated that in performing the choice of law assessment on remand, the district court could very well decide that considerations of fairness would require application of municipal law of the foreign state where the events occurred, in which event "our courts will not have occasion to consider what law would govern a suit under the [ATCA] where the challenged conduct is actionable under the law of the forum and the law of nations, but not the law of the jurisdiction in which the tort occurred."[13]

■ This Court, in performing the requisite choice of law inquiry in the instant case, grappled with the meaning and implications of the *Filartiga I* court's mandate. Under traditional choice of law inputs relevant to the matter at hand, the United States has a significant interest in providing a forum for the adjudication of claims under the ATCA alleging certain violations of international human rights law, thereby advancing the realization of the values embodied in universally recognized norms.[14] However, given the jurisdictional facts present here, Zimbabwe would have the predominant interests in the adjudication of this case pursuant to Zimbabwe law. All of the Plaintiffs are citizens of Zimbabwe. ZANU-PF is the country's ruling political party, headed by Mugabe. All of the events Plaintiffs describe as constituting the actionable conduct and correspond-

ing injuries occurred in Zimbabwe, arising out of political conflicts and social conditions prevailing there. Thus, the pertinent relationships between this action and the parties and underlying events are predominantly connected with Zimbabwe.[15] Zimbabwe therefore has a strong interest in the application of its local law to the resolution of a controversy so fundamentally rooted in that country.

But what decisional rules should apply if, as discussed below, the governing law of Zimbabwe, while in general terms recognizing some of the rights Plaintiffs invoke here under the ATCA, does not define specific causes of action to vindicate the particular claims asserted, or does not permit recovery of the kinds of damages Plaintiffs seek, or may otherwise bar liability, so that the effect of applying the entire municipal law of Zimbabwe to address the violations of international law here alleged would be to defeat some or all of Plaintiffs' claims and thus the remedy the ATCA contemplated?

Similar concerns have been articulated by other courts that have encountered and addressed these complexities in determining the source of substantive law to apply in adjudicating ATCA claims. The doctrinal underpinnings of the dilemma is best captured in the divergent approaches expressed by the concurring opinions of the Circuit Court in *Tel-Oren v. Libyan Arab Republic*,[16] as to whether the ATCA, be-

---

**12.** *Filartiga I,* 630 F.2d at 889 (citing *Home Ins. Co. v. Dick,* 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926 (1930)); *see also* Jeffrey M. Blum and Ralph G. Steinhardt, *Federal Jurisdiction over International Human Rights Claims: The Alien Tort Claims Act after Filartiga v. Pena–Irala,* 22 Harv. Int'l L.J. 53, 97–98 (1981).

**13.** *Filartiga I,* 630 F.2d at 889.

**14.** *See Wiwa,* 226 F.3d at 106; *Filartiga I,* 630 F.2d at 887.

**15.** *See Filartiga II,* 577 F.Supp. at 864 (finding on remand that choice of law analysis required application of Paraguay law because all of the parties were residents of that country and the underlying events happened there); *see also Restatement (Second) of Conflict of Laws, supra* § 6 cmt. f.

**16.** 726 F.2d 774 (D.C.Cir.1984).

yond conferring federal court jurisdiction, creates a cause of action, and as to the sources of any substantive decisional rules governing suits invoking the statute.

As a threshold matter, as Judge Bork observed, international law ordinarily does not create causes of action conferring upon individuals a self-executing right to sue to vindicate particular violations of universally recognized norms.[17] Rather, many international human rights instruments merely enunciate in expansive generalities particular principles, aspirations and ideals of universal and enduring significance. These sources serve as fonts of broadly accepted behavioral norms that nations can draw upon in carrying out their obligations to their peoples. International law ordinarily leaves it to each sovereign state to devise whatever specific remedies may be necessary to give effect to universally recognized standards.[18] As noted by a leading commentator: "International hu-

man rights instruments do not legislate human rights; they 'recognize' them and build upon that recognition [ ]," which assumes the human rights' "preexistence in some other moral or legal order."[19]

To these ends, various international declarations, covenants and resolutions catalogue rights all persons should enjoy; affirm the obligations of nations to ensure those rights by means of implementing legislation; exhort governments to protect and promote widely recognized rights; and pronounce the global community's condemnations and renunciations of wrongful practices.[20] In the words of Judge Bork: "Some define rights at so high a level of generality or in terms so dependent for their meaning on particular social, economic and political circumstances that they cannot be construed and applied by courts acting in a traditional adjudicatory manner."[21]

---

**17.** *See id.* at 816–17.

**18.** *See Restatement (Third) of the Foreign Relations Law of the United States* (1987) § 703 cmt. c. [hereinafter the *"Restatement of Foreign Relations "*].

**19.** *The International Bill of Rights* 12, 15 (Louis Henkin, ed.) (1981) [hereinafter *"The International Bill of Rights "*].

**20.** *See, generally, Universal Declaration of Human Rights* (the "Universal Declaration"), G.A. Res. 217A(III), 3 U.N. GAOR, U.N. Doc. A/810 (1948), *reprinted in* United Nations Centre for Human Rights, *Human Rights: A Compilation of International Instruments* (hereinafter *"International Instruments "*), Vol. I, Pt. 1, at 1–7 (1994); *Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* (the "Torture Convention"), G.A. Res. 39/46, 39 U.N. GAOR Supp. (No. 51), at 197, U.N. Doc. A/39/51 (1984), *reprinted in International Instrument, supra,* Vol. I, Pt. 1, at 293–307; *International Covenant on Civil and Political Rights* (the "Civil and Political Rights Covenant" or the "Covenant"), G.A. Res. 2200A(XXI), 21 U.N. GAOR

Supp. (No. 16), at 52, U.N. Doc. A/6316 (1966), *reprinted in International Instruments, supra,* Vol. I, Pt. 1, at 21–40; *African Charter on Human and Peoples' Rights* (the "African Charter"), OAU Doc. CAB/LEG/67/3 rev. 5, 21 I.L.M. 58 (1982), *reprinted in International Instruments, supra,* Vol. II (1997), at 330–346; *American Convention on Human Rights* (the "American Convention"), OEA/Ser. K/xvi/1.1, Doc. 65, Rev. 1. Corr. 1, Jan. 7, 1970, 9 I.L.M. 101 (1970), *reprinted in International Instruments, supra,* Vol. II at 14–36; *European Convention for the Protection of Human Rights and Fundamental Freedoms* (the "European Convention"), 213 U.N.T.S. 211, E.T.S. 5 (1950), *reprinted in International Instruments, supra,* Vol. II at 73–91.

**21.** *Tel–Oren,* 726 F.2d at 818 (Bork, J., concurring); *see also Xuncax,* 886 F.Supp. at 180; *but see Tel–Oren,* 726 F.2d at 778 (Edwards, J., concurring) (noting that in some cases, as in the United Nations Genocide Convention, states have specifically committed to carry out their international obligations through explicitly prescribed means, such as declaring a form of conduct as defined to constitute a crime).

■ These norms and practices acquire the status of customary "law of nations" only insofar as they ripen over time into settled rules widely recognized and enforced by international agreements, by judicial decisions, by the consistent usage and practice of states and by the "general assent of civilized nations." [22]

■ But, because such customary principles and practices of sovereign states do not derive and acquire the status of law from the authoritative pronouncements of any particular deliberative body, they generally do not create specific "causes of action" or a self-executing right to sue entitling victims to institute litigation to vindicate violations of international norms.[23] As one court expressed this point: "While it is demonstrably possible for nations to reach some consensus on a binding set of principles, it is both unnecessary and implausible to suppose that, with their multiplicity of legal systems, these diverse nations should also be expected or required to reach consensus on the types of actions that should be made available in their respective courts to implement those principles." [24]

■ Nonetheless, under *Filartiga I*, certain wrongful conduct violates the law of nations, and gives rise to a right to sue cognizable by exercise of federal jurisdiction under the ATCA, when it offends norms that have become well-established and universally recognized.[25]

The *Filartiga I* court, however, did not explicitly address whether the federal right of action it inferred existed under the ATCA in fact derives from and is to be substantively adjudicated by principles drawn from international law or from federal or municipal law. Manifesting some ambiguity on this point, the court construed the ATCA "not as granting new rights to aliens, but simply as opening the federal courts for adjudication of the rights already recognized by international law." [26] Rather, as stated above, the Second Circuit directed that once federal jurisdiction is properly exercised by means of the threshold determination that the claimant has asserted a recognized violation of international law, the rules of decision applicable to adjudication of the case must be decided by a choice of law inquiry employing the considerations set forth in *Lauritzen*.[27]

**22.** *The Paquete Habana,* 175 U.S. 677, 694, 20 S.Ct. 290, 44 L.Ed. 320 (1900); *see also United States v. Smith,* 18 U.S. 153, 160–61, 5 Wheat. 153, 5 L.Ed. 57 (1820); *Filartiga I,* 630 F.2d at 880; *Restatement of Foreign Relations, supra* § 102; *Statute of the International Court of Justice,* June 26, 1945, Art. 38, 59 Stat. 1055, T.S. No. 993, 3 Bevans 1179.

**23.** *See Tel–Oren,* 726 F.2d at 778 ("[T]he law of nations never has been perceived to create or define the civil actions to be made available by each member of the community of nations; by consensus, the states leave that determination to their respective municipal laws.") (Edwards, J., concurring).

**24.** *Xuncax,* 886 F.Supp. at 180; *see also* Louis Henkin, *Foreign Affairs and the Constitution* 224 (1972) ("International law, itself, finally, does not require any particular reaction to

violations of law . . . ."); *Restatement of Foreign Relations, supra* § 703 cmt. c.

**25.** 630 F.2d at 888; *see also Alvarez–Machain v. United States,* 266 F.3d 1045, 1050 (9th Cir.2001)(to be actionable under the ATCA, international norms must be "specific, universal and obligatory."); *Xuncax,* 886 F.Supp. at 184 (citing *Forti I,* 672 F.Supp. at 1540).

**26.** 630 F.2d at 887.

**27.** *See Lauritzen,* 345 U.S. at 571, 73 S.Ct. 921. The Supreme Court in *Lauritzen,* a maritime case, articulated seven factors to be weighed in the relevant choice of law analysis: (1) place of the wrongful act; (2) law of the flag; (3) allegiance or domicile of the injured party; (4) allegiance of the defendant; (5) place of contract; (6) inaccessibility of foreign forum; and (7)the law of forum. *See id.* at 583–90, 73 S.Ct. 921.

In his *Tel–Oren* concurrence, Judge Edwards endorsed the view of the Second Circuit that ATCA itself creates a right to sue for alleged violations of the law of nations.[28] He voiced a reservation, however, that the *Filartiga I* formulation "is not flawless" and recognized that the task the ruling entrusts to the district court at the threshold jurisdictional finding is daunting.[29] On this point, he noted that the *Filartiga I* approach "places an awesome duty on federal district courts to derive from an amorphous entity—*i.e.*, the 'law of nations'—standards of liability applicable in concrete situations." [30]

The difficulty inherent in the *Filartiga I* charge is compounded by the second phase of the inquiry the ruling mandates, that of deciding the substantive standards to apply in evaluating ATCA claims involving human rights abuses. The challenge has engendered significant conceptual division and divergent practices among the courts that have addressed the question. In *Tel–Oren*, for example, Judge Edwards suggested, as an alternative formulation to the *Filartiga I* approach, that litigation may be brought under ATCA asserting substantive rights of action defined as common law torts, with the rules of decision supplied by domestic law of the United States, as long as a violation of international law is also alleged.[31] The alternative also has been the subject of considerable differences among the courts and has generated numerous permutations and adaptations variously applying, as the basis of substantive law in ATCA adjudications, rules of decision drawn from: federal common law; the forum state; the foreign jurisdiction most affected; international law; or a combination of these sources.

In *Adra v. Clift*,[32] for example, the court applied the alternative formulation where the tort, that of abducting a child from a parent entitled to custody, was defined by municipal law, and the violation of the law of nations consisted of the misuse of a passport as the means to carry out the wrongful conduct. A variation of this approach was followed in *Trajano v. Marcos*,[33] where the Ninth Circuit endorsed the district court's application of the *Tel–Oren* alternative as modified to rely upon the domestic law of the foreign jurisdiction, rather than that of the United States, to provide the cause of action. But in *Doe v. Unocal Corp.*[34] the Ninth Circuit determined the liability of a private third-party in an ACTA claim by reference to international law, rather than the municipal law of the foreign state, or federal or forum state law, where the alleged violations implicate only peremptory norms (*jus cogens*).[35] In

---

28. 726 F.2d at 780.

29. *Id.* at 781.

30. *Id.*

31. *Id.* at 782.

32. 195 F.Supp. 857 (D.Md.1961). In *Tel–Oren*, Judge Edwards questioned the sufficiency of the *Adra* court's determination that misuse of a passport could rise to the level of a violation of international law for the purposes of invoking ATCA jurisdiction. 726 F.2d at 787 (Edwards, J., concurring).

33. 978 F.2d 493, 503 (9th Cir.1992) ("*Marcos I*").

34. 2002 WL 31063976, at *11, —— F.3d ——, —— (9th Cir.2002).

35. *But see id.* at *27, —— F.3d ——, —— (Reinhardt, J., concurring) (rejecting the majority's application of international law and noting that "courts should not *substitute* international law principles for established federal common law. or other domestic law principles ... unless a statute mandates that substitution, or other exceptional circumstances exist.") (emphasis in original).

*Hilao v. Marcos*,[36] another panel of the same court held that ATCA creates a cause of action for violations of universal human rights standards and applied federal law to decide a survival of claim issue without any choice of law analysis or review of municipal law.

In *Xuncax*, however, the court rejected the domestic law right to sue alternative in favor of a different approach. The court applied violations of international law as the basis for both the exercise of ATCA jurisdiction and as the source of the pertinent substantive cause of action "without recourse to other law".[37] Noting that municipal law may be inadequate to address in a meaningful way alleged violations of international human rights, the court suggested that under the approach it proposed "courts will be freer to incorporate the full range of diverse elements that should be drawn upon to resolve international legal issues than they would if bound to straightforward recurrence to extant domestic law."[38]

In *Wiwa*, the Second Circuit acknowledged these fundamental qualms and alternative formulations, but declined to reach the issue because its decision to sustain ATCA jurisdiction in the case before it was based on other grounds.[39] However, several considerations counsel against a narrow reading and rigid application of *Filartiga I* as compelling unyielding allegiance to municipal law derived from choice of law analysis to supply the exclusive substantive cause of action and rules of decision governing adjudication of the merits of international human rights claims invoking the ATCA.

First is the treatment of the issue by the district court on remand. Grappling with the difficulties its mandate from the Second Circuit presented, Judge Nickerson addressed the open questions head on.[40] While conducting the choice of law analysis enunciated by the Circuit Court's ruling, Judge Nickerson considered whether the "tort" to which that statute refers means "a wrong 'in violation of the law of nations' or merely a wrong actionable under the law of the appropriate sovereign state?"[41]

Judge Nickerson responded to this question by determining that the court's inquiry was not circumscribed by, nor did it necessarily end with, the municipal law of the foreign state where the alleged international tort occurred. The interests of the foreign state were relevant in this context, but only "to the extent they do not inhibit the appropriate enforcement of the applicable international law or conflict with the public policy of the United States."[42] Rather, the district court determined that definition of the relevant wrongful conduct should be guided by the norms and practices universally recognized by the international community, and not by the laws of a particular state. "[W]here the nations of the world have adopted a norm in terms so formal and unambiguous as to make it international 'law,' the interests of the global community transcend those of any one state."[43] Consistent with these principles, Judge Nickerson found that:

---

**36.** 25 F.3d 1467, 1475–76 (9th Cir.1994) (*"Marcos II "*).

**37.** 886 F.Supp. at 182–83.

**38.** *Id.; see also Filartiga II*, 577 F.Supp. at 863.

**39.** 226 F.2d at 88 n. 12.

**40.** *See Filartiga II*, 577 F.Supp. at 862.

**41.** *Id.* at 862.

**42.** *Id.* at 863–64.

**43.** *Id.* at 863.

[T]here is no basis for adopting a narrow interpretation of [the ATCA] inviting frustration of the purposes of international law by individual states that enact immunities for government personnel or other such exemptions or limitations. The court concludes that it should determine the substantive principles to be applied by looking to international law, which, as the Court of Appeals stated, "became a part of the common law *of the United States* upon the adoption of the Constitution."[44]

According to the broader view of the scope of the ATCA that Judge Nickerson propounded, Congress entrusted to the federal courts the task of determining the substantive rights to be applied to ATCA claims by reference to international standards, as well as the "power to choose and develop federal remedies to effectuate the purposes of the international law incorporated into United States common law."[45] On this basis, the district court determined that the laws defining substantive rights recognized by the foreign state in the case before it (Paraguay) prohibited torture. The court applied that body of law to determine liability, but also found no provision in it authorizing punitive damages. Nonetheless, Judge Nickerson awarded such damages in order to effectuate the federal policy embodied in the ATCA and the clear objectives reflected in the international prohibition against state-promoted torture.[46]

Second, the broader approach adopted by the district court in *Filartiga II* has gained recognition and acceptance by other federal courts that have considered ATCA claims in the face of inadequate or conflicting municipal law of the foreign state. Under these circumstances, rather than relying wholesale on foreign municipal law, the courts uniformly have undertaken to fashion a remedy by reference to the full range of available decisional guides and sources, in particular principles derived from federal common law. These precedents speak to the shortcomings of an approach that would compel an undeviating or even primary reliance on municipal law to adjudicate claims under the ATCA.

In *Xuncax*, for example, given the ATCA's silence concerning a claimant's standing to bring suit to vindicate harms to another victim, the district court sought a suitable rule of decision to adjudicate claims for summary execution and disappearance based on injuries to third persons. Relying on the doctrine that where federal legislation creates a cause of action without specifying vital details the courts look to analogous state law insofar as it would not defeat the purposes of the federal statute, the *Xuncax* court determined that the TVPA provided the most analogous remedy.[47] The court also invoked the TVPA to apply Guatemala law, rather than a forum state rule of decision which would have barred recovery, to decide the right of a sibling to sue under the ATCA.[48]

**44.** *Id.* (quoting *Filartiga I,* 630 F.2d at 886) (emphasis in original).

**45.** *Id.*

**46.** *See id.* at 867.

**47.** 886 F.Supp. at 191 (citing the TVPA and its legislative history as supporting the court's approach); *see also* The Rules of Decision Act, 28 U.S.C. § 1652. The statute provides

that: "The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply." 28 U.S.C. § 1652.

**48.** *See Xuncax,* 886 F.Supp. at 191–92.

Similarly, in *Forti I* the district court faced a choice of whether to apply a federal or state limitations period. It found a germane analogy in the federal Civil Rights Act,[49] and did not feel compelled to look beyond the relevant body of federal law to formulate an appropriate decisional rule.[50]

Third, several conceptual, policy and practical constraints caution against strict adherence to municipal rules of the foreign state in defining the scope of substantive rights and causes of action to be applied in adjudicating ATCA claims, and counsel instead a measure of flexibility, as reflected by the cases cited above, to enable the courts to fashion remedies compatible with the principles of federal common law and the content of universally recognized norms of international law.

Just as the sources from which universal norms of international conduct derive are often articulated as generalities or conclusory precepts, equally so many principles of the organic law of sovereign states are typically expressed in terms that are no less sweeping nor any more self-executing. Pronouncements recognizing fundamental rights governing the state's conduct in relation to its people are not always accompanied by corresponding promulgations of specific definitions and causes of action authorizing enforcement through private suits. In consequence, in their assessments of ATCA claims, courts looking to foreign municipal law are likely to encounter common situations, as experienced in the cases discussed above and by this Court in reviewing principles of Zimbabwe law in the matter at hand, that raise signif-

icant choice of law impediments to the application of the ATCA and hinder the furthering of the goals of international standards.

■ The municipal law, for example, may manifest general domestic recognition of a fundamental norm without specifically elevating it further into a defined private right of action. Local rules may also provide a remedy that may not suffice to adequately highlight and respond to the gravity of the conduct and the import of the case. Or else the foreign law may contain no relevant decisional rule at all. Or it may provide a standard that, if applied to adjudicate specific ATCA claims, would dispose of the case in a manner that would defeat a remedy consistent with fostering the purposes of federal and international law. As succinctly phrased by the *Xuncax* court: "Simply put, municipal law is ill-tailored for cases grounded on violations of the law of nations."[51]

This situation may prevail for several reasons. Even today—despite evidence of more widespread recognition of universal standards through the proliferation of international instruments among the many sovereign nations in the world, with their multiplicity of histories, cultures and customs, and diverse stages of development— there are many jurisdictions in which the rule of law as we know it remains a relatively recent and still incipient adaptation. Thus, in these states the enunciation of substantive definitions, and elaboration of causes of action and corresponding decisional rules necessary to govern all aspects of the full range of mature, enforceable

---

**49.** 42 U.S.C. § 1983.

**50.** 672 F.Supp. at 1547–48; *see also Marcos II*, 25 F.3d at 1476 (applying federal Eighth Amendment and Civil Rights Act decisional law in determining whether plaintiffs' cause of action extinguished on defendant's death);

*Unocal*, 2002 WL 31063976, at *11, —— F.3d ——, —— (applying international law principles to determine the liability of a private third-party for violations of international law).

**51.** 886 F.Supp. at 192.

rights common in our jurisprudence, remain at various rudimentary stages, if they exist at all.

Another limitation inherent in placing undue reliance on municipal law of the foreign state in choice of law analysis is reflected in actions, such as the case at bar, that charge egregious misconduct by the sitting government itself through measures taken by the highest ranking officers of the regime. These are the very officials whose public duties encompass enacting, enforcing and construing domestic laws, and deciding the state's compliance with international norms. It is unlikely to escape the notice of government leaders who defile the powers of their offices by resorting to the barbarism of state-sponsored torture and murder, and to the brutalities characteristic of inhuman treatment of their nation's own people, to equally dishonor the municipal justice system and its laws in order to immunize themselves from accountability and liability for their wrongs. Doctrines such as absolute or qualified immunity for the state and government personnel, statutes of limitations, and definitions of state action and other exemptions, may be easily perverted by self-serving enactments specifically designed to shield the misconduct of the selfsame offenders whose deeds define the deviation from universal norms, thereby subverting international law. Were the federal courts obliged to give unremitting recognition and deference to the substantive laws and defenses compelled by municipal law under a choice of law analysis, in some instances such application of foreign law could frustrate the right of action the ACTA was designed to confer upon the victims of international lawlessness.

Moreover, as described above, well-established, universal, and obligatory norms defining rules of international conduct, evolve by custom and usages of nations over time. They are further elaborated by the works of reputable jurists and scholars and settled through longstanding practice and application in judicial decisions recognizing and enforcing those rules.[52] In consequence, because customary international norms are not always fixed in codifications or treaties, not every nation will necessarily reflect clearly in its domestic jurisprudence principles that manifest its unequivocal assent and adherence to universal standards that may override municipal rules.

By the same token, under customary practice in many global bodies, the declarations, resolutions and covenants that embody international practices are adopted by consensus. This procedure, while giving some legitimacy to the content of the instrument as evidence of broad recognition, at times conceals the degree of unstated reservations or dissent among regimes that do not voice their objections and instead silently join the consensus in response to the pushes and pulls of internal and external social and political pressures. Accordingly, while it may be expedient for a state to refrain from objecting to the international community's promulgation of particular standards to govern relations among nations and their subjects, its tacit acceptance does not always translate into enactment of corresponding municipal law giving meaning and force to the generalities articulated in the instruments with which the state publicly associates itself.

Thus, a gap sometimes exists between the public concurrence the state professes abroad to norms of international conduct in their relations with the community of nations and the measures it actually adopts at home to enable its people to

---

**52.** *See The Paquete Habana,* 175 U.S. at 700, 20 S.Ct. 290; *Filartiga I,* 630 F.2d at 880.

realize the benefits of those universal rules. It is not uncommon in international practice for states to pay lip-service homage to the promulgation of particular international instruments, and even to ratify binding covenants, but then delay or fail altogether to adopt the municipal implementing legislation necessary to give the enunciated international rights meaningful domestic legitimacy and create an effective national means to vindicate them.[53]

For much of the same reasons, adjudication of claims that assert violations of customary international law and seek to vindicate universally recognized rights often engenders conceptual anomalies between the gravity of the offenses, the high promise conveyed in lofty terms by universally recognized rights, and the limited scope of available municipal remedies. Human rights offenses universally held to contravene the law of nations occupy the low ground reserved by civilized people to rank the most heinous of human behavior. Typically these wrongs are correspondingly branded in language employing the most profound opprobrium, fittingly portraying the depths of depravity the conduct encompasses, the often countless toll of human suffering the misdeeds inflict upon their victims, and the consequential disruption of the domestic and international order they produce. These expressions mark the high stakes enshrined by universally outlawed practices such as genocide; slavery; torture; summary execution;

forced disappearance; war crimes and crimes against humanity.[54]

Between the horrid deeds these recognized atrocities proclaim, and the ringing words and promises with which they are universally condemned and renounced in solemn international instruments, lies a reality: that extant municipal law may not be available or may lag behind the need in providing adequate or readily accessible remedies to redress universally recognized wrongs, and that not infrequently, in the absence of any particular right of action specifically defined and promulgated to fit the real wrongs at hand, such means of relief as may exist are achieved only by Procrustean analogies that do not always capture or do justice to the actual grievousness associated with the offenses. Thus, for example, under municipal law of some jurisdictions, the magnitude of genocide and murder by torture and extrajudicial killing may have to be adjudged and remedied in accordance with ordinary civil tort standards prescribed in wrongful death statutes. Wholesale degradations and deprivations of all traces of human dignity perpetrated by cruel, inhuman or degrading treatment may be civilly prosecuted under local principles defining assault and battery or infliction of emotional distress. Forced disappearance and prolonged arbitrary detention may be classified as false imprisonment.[55]

To be sure, some aspects of international offenses may share elements with the ordinary municipal law torts. But, in

---

**53.** *See* Louis Henkin, *The Age of Rights* ix-x (1990) (noting that despite universal acceptance of the concept of international human rights, that consensus "is at best formal, nominal, perhaps even hypocritical, cynical," though still maintaining that even giving hypocrisy its due, it is the idea of human rights, to which no state has offered a preferable alternative, that has dominated the global community's debate and gained international currency in recent decades).

**54.** *See generally Restatement of Foreign Relations, supra* § 702; Blum & Steinhardt, *supra* at 90–96.

**55.** *See, e.g., Xuncax,* 886 F.Supp. at 183, 200; *Filartiga II,* 577 F.Supp. at 865–66; *Mehinovic v. Vuckovic,* 198 F.Supp.2d 1322, 1357 (N.D.Ga.2002).

practice, the acute form of misconduct entailed in international violations in many cases amounts to more than mere differences in degree, and assumes differences in kind so fundamental as to compel distinct treatment under universally recognized rules. The "enemy of all humankind", in legal if not in genetic terms, often ranks as a different species from the ordinary tortfeasor of the typical case.[56] Equally so is the class of universal rules that outcast the international outlaw, and thus declare him unworthy of all sovereign protections, distinguished from the global community's exhortations of aspirational norms or even from customary international law.[57]

The difficulties, as evidenced by the courts that have addressed the issues, arise not merely as a question of semantics that demean the international standards. Rather, the greater concern lies in potential results that could frustrate efforts to fashion relief commensurate with the real repugnance of international wrongs and their profound effects, in other words, remedies that do not vindicate and recompense the victims of state-sponsored genocide and murder as if they had suffered

nothing more than common law defamation and battery.[58]

*Tel–Oren,* for example, involved what Judge Edwards characterized as a "barbaric rampage" in which terrorists took 121 civilians hostage and "tortured them, shot them, wounded them and murdered them," killing 22 adults and 12 children and seriously wounding 73 adults and 14 children, before police managed to stop the "massacre."[59] Although the dismissal of the case was sustained on substantive grounds, the district court had ruled alternatively that the action was also barred by the local one-year statute of limitations applicable to certain torts, such as assault and battery.[60]

For the same reasons, other courts, in order to reflect the true magnitude of the universally recognized wrongs at issue and confer relief proportionate to the harms engendered, have felt compelled to pick and choose from among available remedial options one that advances the purposes of the ATCA and international law, in doing so sometimes ignoring constraints of municipal law to fashion relief even when the foreign law did not specifically recognize a remedy. The underlying decisional rules at issue in these cases have involved, for

---

**56.** *See Filartiga I,* 630 F.2d at 890 ("[F]or the purposes of civil liability, the torturer has become like the pirate and slave trader before him hostis humani generis, an enemy of all mankind.").

**57.** *See Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 715–16 (9th Cir.1992) (describing the distinction under international law principles between peremptory norms (*jus cogens* ), the obligations of which are binding on all states and from which there can be no derogation, and customary international law that derives from the consent of states).

**58.** *See Mehinovic,* 198 F.Supp.2d at 1359 (recognizing that under international law, compensation for a broad range of physical,

emotional and social harms should be commensurate to the injury) (citing M. Whiteman, *Damages in International Law* 718–19 (1943)).

**59.** 726 F.2d at 776 (Edwards, J., concurring).

**60.** *See id.* at 799 n. 2 (citing *Tel–Oren v. Libyan Arab Republic,* 517 F.Supp. 542, 550–51 (D.D.C.1981)); *cf.* `Convention on the Non–Applicability of Statutory Limitations to War Crimes and Crimes against Humanity,* G.A. Res. 2391 (XXIII), 23 U.N. GAOR Supp. (No. 18), at 40, U.N. Doc. A/7218 (1968) Art. 1, *reprinted in International Instruments, supra,* Vol. I, Pt. 2 at 679 (declaring that no statutory limitation shall apply to bar the prosecution of war crimes and crimes against humanity irrespective of the date of their commission).

example, survival of a cause of action after defendant's death;[61] the right of a sibling of the victim to bring an action under the ATCA;[62] the applicable statute of limitations;[63] and punitive damages.[64]

A final drawback to a choice of law approach mandating strict adherence to municipal law in redressing international law violations in ATCA cases is the practical and jurisprudential complexities that inhere in discerning, construing and enforcing substantive rules of decision formulated by foreign courts, legislatives or administrative bodies.[65] The intricacies and challenges are compounded in ATCA adjudications by the integral links and interplay that exist between the application municipal and international law for both jurisdictional and decisional purposes. Though the Federal Rules of Civil procedures provide guidance for federal courts in applying foreign law,[66] this authority does not mitigate the conceptual and pragmatic obstacles always associated with in the task.

## B. *EMERGENCE OF FEDERAL COMMON LAW POST–FILARTIGA*

■ In synthesis, the foregoing case law reflects the emergence of a set of decisional rules federal courts have crafted to give scope and content to the cause of action the ATCA creates as it relates to international human rights law. Under these principles, as regards to misconduct that violates universally recognized norms of international law, the cases suggest several standards to guide ATCA choice of law determinations: (1) the local law of the state where the wrongs and injuries occurred and the parties reside may be relevant and may apply to resolve a particular issue insofar as it is substantively consistent with federal common law principles and international law and provides a remedy compatible with the purposes of the ATCA and pertinent international norms;[67] (2) in the event the local law of the foreign state of the parties' residence and underlying events conflicts with federal or international law, or does not provide an appropriate remedy, or is otherwise inadequate to redress the international law violations in question, a remedy may be fashioned from analogous principles derived from federal law and the forum state, or from international law embodied in federal common law;[68] (3) should the application of law from federal and forum state principles as to some aspect of the claim defeat recovery, an analogous rule drawn from the municipal law of the foreign jurisdiction may be applied to the extent it supplies a basis for a decisional rule that

61. *See, e.g., Marcos II*, 25 F.3d at 1476.

62. *See, e.g., Xuncax*, 886 F.Supp. at 191–92.

63. *See, e.g., Forti I*, 672 F.Supp. at 1547–48; *see also Tel–Oren*, 726 F.2d at 799 n. 2 (Bork, J., concurring) (noting that the district court had dismissed the case on the alternate ground that it was barred by the forum's statute of limitations for certain torts).

64. *See, e.g., Filartiga II*, 577 F.Supp. at 865–66; *but see Xuncax*, 886 F.Supp. at 198, 201 (awarding punitive damages in connection with ATCA claims but denying them as regards municipal law claims on account of doubt as to whether recovery of such damages was permissible under the municipal law of Guatemala).

65. *See Xuncax*, 886 F.Supp. at 183; *see also Tel–Oren*, 726 F.2d at 787 (Edwards, J., concurring).

66. *See* Fed.R.Civ.P. 44.1.

67. *See Filartiga II*, 577 F.Supp. at 863.

68. *See id.; Unocal*, 2002 WL 31063976, at *11; *Abebe–Jira v. Negewo*, 72 F.3d 844, 848 (11th Cir.1996); *Marcos II*, 25 F.3d at 1476; *Xuncax* 886 F.Supp. at 189–91; *Forti I*, 672 F.Supp. at 1547–48.

may permit relief;[69] (4) if some part of the claim cannot be sustained as a violation of international law, a remedy might be found by application of the foreign state's municipal law under the federal court's pendent jurisdiction if so invoked.[70]

In essence, what these precedents represent is the natural evolution of common law, and the organic branching of federal substantive rules through the ATCA, which "established a federal forum where courts may fashion domestic common law remedies to give effect to violations of customary international law."[71] This growth of federal decisional law gives expression to the longstanding principle that the law of nations has always been part of federal law.[72]

As a body of federal law develops under this approach, so as to give content to an ATCA right of action and thus fill in the interstices with federal decisional rules, the federal courts' response acquires the virtues of uniformity and recognition of more diverse sources of substantive standards to draw upon in shaping remedies for adjudication of ATCA claims. The advantages of this approach were noted by the *Xuncax* court's observation that: "[b]y not tethering [the ATCA] to causes of action and remedies previously developed under roughly analogous municipal law, federal courts will be better able to develop a uniform federal common law response to international law violations, a result con-

sistent with the statute's intent in conferring federal court jurisdiction over such actions in the first place."[73]

Finally, a recent Second Circuit explication of *Filartiga I* is consistent with a reading that in appropriate cases would permit a choice of law determination not necessarily compelling dispositive application of foreign law where the municipal rule of decision may conflict with federal law or international standards. In *Wiwa*, the Circuit Court noted that under the choice of law analysis required by *Filartiga I*, the district court would determine whether international law, the law of the forum, *or* the law of the state where the events occurred should provide the substantive law to adjudicate the action.[74]

*Wiwa* acknowledges significant developments in the progression of international human rights law since *Filartiga I* was decided that affect the application of the doctrine enunciated by that case. Most significant of these advances was the enactment of the TVPA in 1991, which the *Wiwa* court construed as both ratifying the holding in *Filartiga I* and significantly carrying it further.[75] The court noted that the TVPA not only grants federal jurisdiction, but makes it clear that it creates liability under United States law for torture and extrajudicial killing, and extends its remedy not just to aliens but to any individual.[76] "The TVPA thus recognizes what was perhaps implicit in [the ATCA]—

---

69. *See Xuncax*, 886 F.Supp. at 191–92.

70. *See id.* at 194–97.

71. *Abebe–Jira*, 72 F.3d at 848 (citing *Kadic v. Karadzic*, 70 F.3d 232, 246 (2d Cir.1995); *Filartiga I*, 630 F.2d at 887; *Xuncax*, 886 F.Supp. at 179–183) *see also Filartiga II*, 577 F.Supp. at 863.

72. *See Filartiga II*, 630 F.2d at 885–86 (citing *The Nereide*, 13 U.S. (9 Cranch) 388, 422, 3 L.Ed. 769 (1815); *The Paquete Habana*, 175

U.S. at 700, 20 S.Ct. 290); *see also Kadic*, 70 F.3d at 246; *Wiwa*, 226 F.3d at 104–05.

73. 886 F.Supp. at 182. (citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 n. 25, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)).

74. 226 F.3d at 105 n. 12.

75. *See id.* at 104.

76. *See id.* at 104–05.

that the law of nations is incorporated into the law of the United States and that a violation of international law. of human rights is (at least with regard to torture) *ipso facto* a violation of U.S. domestic law."[77]

Implicit in all of these developments is that whatever virtue the *Lauritzen* choice of law analysis may have in the context of a maritime case, the evolution of international human rights law in the light of contemporary realities as reflected in the Second Circuit's recognition of these developments, points to the necessity of staking out a more flexible course in the determination of the substantive law to be applied in adjudicating ATCA cases. Against this more ample exposition of the considerations that guide its decision, the Court proceeds to conduct its choice of law inquiry as it pertains to Plaintiffs' ATCA claims.

## C. *CHOICE OF LAW ANALYSIS AND APPLICATION OF THE PERTINENT RULES OF DECISION*

Having examined the pertinent provisions of the Zimbabwe Constitution and relevant legal doctrine called to the Court's attention in Plaintiff's submission,[78] the Court is persuaded that this authority, though not explicitly creating defined causes of action as to all claims, sufficiently proscribes wrongful conduct and protects substantive rights encompassing Plaintiffs' claims asserting (1) torture and extrajudicial killing, (2) cruel, inhuman or degrading treatment, (3) denial of politi-

cal rights, and (4) systematic racial discrimination. The Court is not persuaded that a sufficient basis for recovery exists under international law for Plaintiffs' claims asserting uncompensated seizure of their property. However, Plaintiffs have also sufficiently established legitimate grounds for recovery on their expropriation claims under Zimbabwe law.

### 1. *Torture and Extrajudicial Killing*

In their Claims One and Two, Plaintiffs seek monetary relief under the TVPA and ATCA to redress the torture and extrajudicial killing of Metthew Pfebve, David Stevens and Tafuma Chiminya Tachiona. The Magistrate Judge found that these individuals had been subjected by an organized mob of ZANU–PF members to severe pain and suffering by means of torture before being brutally murdered.[79] Specifically, the Magistrate Judge found as follows:[80]

### a. *Tapfuma Chiminya Tachiona*

Tapfuma Chiminya Tachiona was a founding member of the [Movement for Democratic Change "MDC"], the National Youth Organizer for the MDC, and a close companion of Morgan Tsvangirai, the President of the MDC. On April 15, 2000, whole Mr. Chiminya was campaigning with Mr. Tsvangirai, a group of ZANU–PF supporters attacked them. Managing to escape, Mr. Chiminya drove injured colleagues to the hospital, after which he reported the incident to the police. On his way home from the police station, he and two other

---

**77.** *Id.* (citing H.R.Rep. No. 102–367, at 4 (1991), *reprinted in* 1992 U.S.C.C.A.N. 84, 86).

**78.** *See* Fed.R.Civ.P. 44 (In determining the content and meaning of the laws of a foreign country, a court may examine and consider "any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules

of Evidences"); *see also Overseas Dev. Disc. Corp. v. Sangamo Constr. Co.*, 840 F.2d 1319, 1324 (7th Cir.1988).

**79.** *See Tachiona,* 216 F.Supp.2d at 275.

**80.** *See id.* at 270–74 (internal citations omitted).

MDC supporters, Sanderson Makombe and Talent Mabika, were again stopped by ZANU–PF members, who began attacking them with knives and sticks. Mr. Makombe was able to escape through the window of the vehicle and hid in the nearby brush, but Mr. Chiminya and Ms. Mabika remained trapped inside the truck as the assailants continued to beat them. Mr. Chiminya was hit repeatedly in the head with the butt of a gun, according to Mr. Makombe. At that point, the assailants doused the vehicle with gas, causing the whole truck to go up in flames. The attackers then jumped in their vehicle and fled, soon after which Mr. Chiminya and Ms. Mabika managed to tumble out of the burning truck. Mr. Chiminya "was just like a ball of flames running across the tarred road," according to Mr. Makombe. He ran toward a field and collapsed, but died before Mr. Makombe could reach him.

### b. *David Yendall Stevens*

David Stevens and his wife, Maria, owned a private commercial farm in Zimbabwe. Mr. Stevens was a known supporter of the MDC. On February 12, 2000, their farm was invaded by twenty-six ZANU–PF and ZWVA members and supporters. After that initial invasion, there have been a number of incidents of violence. For example, on two occasions, several female farm workers were assaulted and on one occasion, one was raped. Complaints to the police went unheeded.... On April 15, 2000, ZANU–PF and ZWVA members killed the Stevens' dog and abducted David Stevens and five others. All six were severely beaten and tortured, and Mr. Stevens was forced to drink diesel oil.

Several of Mr. Stevens' neighbors observed the kidnapping and attempted to come to his aid by following his abductors to the police station. Once there, they were taken hostage as well, bound with rope, and driven away in two different vehicles. The men were tortured in a variety of ways, including being burned with cigarettes; beaten on the soles of their feet; beaten with rods, rocks and iron bars; hit in the face; and whipped with a fan belt from a car. In addition, their legs were cut with knives and they were threatened with having their ears and testicles cut off. Mr. Stevens was summarily executed later that same day.

### c. *Metthew Pfebve*

[O]n April 29, 2000, ZANU–PF supporters approached the Pfebve home wielding axes, spears, sticks, and stones. The Pfebve family ran in different directions. Metthew Pfebve's mother managed to run into the outhouse, but was eventually found and pelted with stones by the assailants. The plaintiff and his father were attacked with stones, sticks and fists, then dragged down the road. The plaintiff's father was eventually dropped unconscious on the road, suffering deep lacerations to his head and several broken fingers. Meanwhile, Metthew Pfebve was carried away by the assailants. He was found dead the next day, naked and lying in the middle of the road, approximately one and one-half kilometers from his home. He had been severely beaten. The plaintiffs allege that he was in all likelihood tortured prior to his death at or nearby a primary school which the defendant had turned into a torture camp.

To vindicate Plaintiffs' rights asserted in Claims One and Two, the Magistrate Judge recommended recovery of compensatory and punitive damages against ZANU–PF under both the TVPA and the ATCA. In *Tachiona III*, the Court

adopted the Report's recommendation of damages with regard to Plaintiffs' claims of torture and extrajudicial killing under the TVPA.[81]

■ In considering Plaintiffs' Claims One and Two under the ATCA, the Court notes that the Zimbabwe Constitution contains provisions that explicitly prohibit both torture and extrajudicial killing. Article 12(1) states that "No person shall be deprived of his life intentionally save in execution of the sentence of a court in respect of a criminal offense of which he has been convicted."[82] Similarly, Article 15(1) declares in relevant part, with elaborations and exceptions not pertinent here, that: "No person shall be subjected to torture[.]"[83] To vindicate rights protected by these provisions, the Zimbabwe legal system establishes civil remedies for victims of certain unlawful deprivations of an individual's rights to life, person or property, as well as for infringements of dignity, reputation or liberty, committed by intentional conduct, including assault, extrajudicial killing and murder.[84] These remedies enable claimants to recover both compensatory and punitive damages from the wrongdoers. The Court finds this authority sufficient to sustain the Magistrate Judge's recommendation of awards under ATCA of compensatory and punitive damages on Plaintiffs' claims of torture and extrajudicial killing.

■ Plaintiffs point out that their claims for torture and extrajudicial killing were filed under both the ATCA and the TVPA. They therefore urge that in addition or alternatively the Court consider the damages Plaintiffs are entitled to recover under the TVPA as undifferentiated damages awarded under the ATCA as well. The Court agrees.

In enacting the TVPA to effectuate this country's commitments under the Torture Convention, Congress gave express definition to causes of action arising under United States law specifying substantive rights and protections of individuals to be free from state-sponsored torture and extrajudicial killing.[85] The Second Circuit has construed this Congressional mandate as embodying recognition that these actions, when committed by foreign states under color of law in violation of international law, "is 'our business,' as such conduct not only violates the standards of international law but also as a consequence violates our domestic law."[86] The Circuit Court thus not only gave expression to Congressional intent favoring the adjudication of TVPA claims in federal courts as a matter of United States policy, but also implicitly recognized that in considering the substantive law governing a cause of action invoking the TVPA the courts may apply federal law rights embodied in the TVPA's definitions of torture and extrajudicial killing to adjudicate the dispute.

The practical effect of this approach is to obviate the need, in connection with torture and extrajudicial killing claims asserted under the TVPA and the ATCA, to

---

81. *See id.* at 267–68.

82. Zimbabwe Const. Art. 12(1). The Zimbabwe Constitution was submitted as Attachment C of Affidavit of Kevin Laue, dated 27 September 2002 ("Laue Aff."), attached to Plaintiff's Memorandum of Law Addressing Choice of Law Analysis Applicable to their claims for Relief Under the Alien Tort Claims Act, dated October 7, 2002.

83. *Id.* at Art. 15(1).

84. *See* Laue Aff., ¶¶ 11, 12 and 13.

85. *See* 28 U.S.C. § 1350 (statutory note); *Wiwa*, 226 F.3d at 104–05; *Kadic*, 70 F.3d at 245–46.

86. *Wiwa*, 226 F.3d at 106.

conduct and adhere to a strict choice of law analysis in accordance with *Filartiga I*, and to offer the courts the ability to apply substantive rights defined by federal law in cases where the law of the foreign state in question may be ambiguous, silent or even incompatible. To this effect, the Second Circuit noted in *Kadic* that: "[t]he [TVPA] permits [claimants] to pursue their claims of official torture under the jurisdiction conferred by the [ATCA] and also under the general federal question jurisdiction of [28 U.S.C.] section 1331 .... " [87]

Accordingly, the Court adopts the Report's recommendation that Plaintiffs be awarded compensatory and punitive damages on their Claims One and Two for torture and extrajudicial killing under the TVPA and the ATCA.

### 2. *Denial of Political Rights*

Plaintiffs' Claims Three and Four under the ATCA assert violations of certain political freedoms: denials of the rights of association, assembly, expression and beliefs and of the right to run for political office and participate in the state's government. The Magistrate Judge recommended

awards of compensatory and punitive damages with respect to these claims, finding that ZANU–PF systematically hounded its political opponents through repeated acts of terror and violence. According to the Magistrate Judge, ZANU–PF specifically targeted Plaintiffs' association with the Movement for Democratic Change ("MDC"), an opposition political party:

> MDC supporters were constantly harassed, peaceful assemblies were interrupted by mobs of ZANU–PF supporters attacking MDC supporters, assassination attempts were made on MDC candidates, and MDC supporters were killed.[88]

The freedoms of political association, speech, beliefs and participation that Plaintiffs assert are recognized in various international instruments. The Universal Declaration contains several provisions itemizing individual rights that go to the essence of a person's political expression and participation, including freedoms of thought and conscience; of opinion and expression; of peaceful assembly and association; and of participation in the government of the person's country.[89]

---

**87.** 70 F.3d at 246 (citing *Xuncax*, 886 F.Supp. at 178).

**88.** *Tachiona III*, 216 F.Supp.2d at 280–81.

**89.** *See* Universal Declaration, *supra*, Arts. 2, 7, 18, 19, 20, 21, *reprinted in International Instruments, supra*, Vol. I, Pt. 1, at 2–5. These provisions declare in pertinent part:

*Art. 2:*
Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status....
*Art. 7:*
All are equal before the law and are entitled without any discrimination to equal protec-

tion of the law. All are entitled to equal protection against any incitement to such discrimination.
*Art. 18:*
Everyone has the right to freedom of thought, conscience and religion...;
*Art. 19:*
Everyone has the right to freedom of opinion and expression; this right includes freedom to hold opinions without interference and to seek, receive and impart information and ideas through any media and regardless of frontiers;
*Art. 20:*
(1) Everyone has the right to freedom of peaceful assembly and association;
*Art. 21:*
(1) Everyone has the right to take part in the government of his country, directly or through freely chosen representatives.

Corresponding provisions are more particularized in the Civil and Political Rights Covenant.[90]

None of these sources, or other authorities elaborating on the scope, content and practical application of these rights, offers

**90.** *See* Political and Civil Rights Covenant, *supra*, Arts. 18, 19, 20, 21, 22, 25 and 26, *reprinted in International Instruments, supra*, Vol. I, Pt. 1, at 27–30. The related provisions of the Covenant state in relevant part:

*Art. 18:*

1. Everyone shall have the right to freedom of thought, conscience and religion. This right shall include freedom to have or to adopt a religion or belief of his choice, and freedom, either individually or in community with others and in public or private, to manifest his religion or belief in worship, observance, practice and teaching.

2. No one shall be subject to coercion which would impair his freedom to have or to adopt a religion or belief of his choice.

3. Freedom to manifest one's religion or beliefs may be subject only to such limitations as are prescribed by law and are necessary to protect public safety, order, health, or morals or the fundamental rights and freedoms of others.

*Art. 19:*

1. Everyone shall have the right to hold opinions without interference.

2. Everyone shall have the right to freedom of expression; this right shall include freedom to seek, receive and impart information and ideas of all kinds, regardless of frontiers, either orally, in writing or in print, in the form of art, or through any other media of his choice.

3. The exercise of the rights provided for in paragraph 2 of this article carries with it special duties and responsibilities. It may therefore be subject to certain restrictions, but these shall only be such as are provided by law and are necessary:

(a) For respect of the rights or reputations of others;

(b) For the protection of national security or of public order (*ordre public*), or of public health or morals.

*Art. 20:*

2. Any advocacy of national, racial or religious hatred that constitutes incitement to discrimination, hostility or violence shall be prohibited by law.

*Art. 21:*

The right of peaceful assembly shall be recognized. No restrictions may be placed on the exercise of this right other than those imposed in conformity with the law and which are necessary in a democratic society in the interests of national security or public safety, public order (*ordre public*), the protection of public health or morals or the protection of the rights and freedoms of others.

*Art. 22:*

1. Everyone shall have the right to freedom of association with others ...

2. No restrictions may be placed on the exercise of this right other than those which are prescribed by law and which are necessary in a democratic society in the interests of national security or public safety, public order (*ordre public*), the protection of public health or morals or the protection of the rights and freedoms of others.

*Art. 25:*

Every citizen shall have the right and the opportunity, without any of the distinctions mentioned in article 2 and without unreasonable restrictions:

(a) To take part in the conduct of public affairs, directly or through freely chosen representatives;

(b) To vote and to be elected at genuine periodic elections which shall be by universal and equal suffrage and shall be held by secret ballot, guaranteeing the free expression of the will of the electors;

(c) To have access, on general terms of equality, to public service in his country.

*Art. 26:*

All persons are equal before the law and are entitled without any discrimination to the equal protection of the law. In this respect, the law shall prohibit any discrimination and guarantee to all persons equal and effective protection against discrimination on any ground such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

*See also* American Convention, *supra*, Arts. 12, 13, 15, 16, 23, 24, *reprinted in International Instruments, supra*, Vol. II at 9, 20, 22; African Charter, *supra*, Arts. 8, 9, 10, 11, 13, *reprinted in International Instruments, supra*, Vol. II at 333–34; European Convention, *supra*, Arts. 9, 10, 11, 14 *reprinted in International Instruments, supra* Vol. II at 77–78.

a particular definition or explicit guidance as to whether and to what extent universal consensus exists concerning the kinds of deprivations of political rights that are cognizable as violations of customary international law. However, the Second Circuit has recognized the significance of the Universal Declaration in "specify[ing]. with great precision the obligations of member nations under the [United Nations] Charter." [91] In this regard, the *Filartiga I* Court acknowledged scholarly opinion, which it cited favorably, for the view that the Universal Declaration "no longer fits into the dichotomy of 'binding treaty' against 'non-binding pronouncement,' but is rather an authoritative statement of the international community." ' [92] Consistent with this proposition, the Circuit Court also noted that "several commentators have concluded that the Universal Declaration has become, in toto, a part of binding, customary international law." [93] Thus, the elemental principles embodied in the Universal Declaration are not only repeatedly invoked by the international community in general pronouncements but have been adopted as part of the constitutions of many states around the world and as such are reflected concretely in applied· organic law.

In considering with greater specificity the content and degree of universality accorded to the political rights at issue in the instant case, the Court must note that the world is characterized by fundamental diversity of political systems and established orthodoxies. A vast range of political thought and channels of expression exists around the globe. So, too, common tensions often prevail between individual and aggregate rights, and majorities versus minorities, on the one hand, and, on the other, the imperatives of maintaining territorial integrity, national security and internal public order, safety and health. Given these realities, the absence of a more particularized expression defining the precise contours of individual civil and political rights as customary international law is not surprising.

 Nonetheless, as sources of guidance for what qualifies as internationally recognized norms relating to the political rights Plaintiffs invoke, the Court may draw from general principles derived from international agreements, declarations and pronouncements on the particular subject, as well as from the general principles common to the world community's major legal systems.[94] In this connection, the Court considers relevant doctrine and expressions reflected in the *Restatement of Foreign Relations* and federal law principles, provisions of the Universal Declaration and the Civil and Political Rights Covenant, and interpretations and applications of these instruments by authoritative international and domestic bodies.

---

91. *Filartiga I*, 630 F.2d at 883.

92. *Id.* (quoting E. Schwelb, *Human Rights and the International Community* 70 (1964)).

93. *Id.* (citations omitted). This opinion is supported as well by other commentators who have urged that, taken as a whole, the Universal Declaration, as supplemented and elaborated by other international human rights instruments and practices of states, through constant invocation, widespread acceptance and global recognition as an authoritative definition and construction of the content of human rights, has acquired the status of customary international law prohibiting the violation of any of the rights enumerated in the Universal Declaration. *See* Myers McDougal, Harold Lasswell and Lung–Chu Chen, *Human Rights and World Public Order* 273–74, 325–27 (1980).

94. *See Filartiga I*, 630 F.2d at 883; *Restatement of Foreign Relations, supra* § 102.

### a. The Restatement of Foreign Relations

Reflecting the absence of greater particularity and universal understanding as to the civil and political rights encompassed within internationally recognized and obligatory norms, § 702 of the *Restatement of Foreign Relations* does not specifically enumerate denial of civil and political rights among the distinct state policies or practices that violate customary international human rights law. The Restatement § 702 lists as customary law the following violations of human rights: (a) genocide, (b) slavery or slave trade, (c) the murder or causing the disappearance of individuals, (d) torture or other cruel, inhuman, or degrading treatment or punishment, (e) prolonged arbitrary detention, (f) systematic racial discrimination, and (g) a consistent pattern of gross violations of internationally recognized human rights. The Restatement notes that the human rights prohibitions enumerated in clauses (a) through (f) are peremptory norms (*jus cogens*) and are not subject to derogation in times of emergency.[95]

Nonetheless, in § 702(g) the Restatement identifies a general category of international human rights violations where, as a matter of policy, a state practices, encourages or condones "a consistent pattern of gross violations of internationally recognized human rights."[96] Among consistent patterns deemed "gross," the Restatement cites as examples: "systematic harassment, invasions of the privacy of the home, arbitrary arrest and detention (even if not

prolonged); ... denial of freedom of conscience ...."[97]

Several observations about § 702(g) are notable and pertinent to the instant case. First, because each of the violations listed in clauses (a) through (f) stands alone as having already acquired the requisite universal acceptance and definition to qualify as customary international law; the reference in clause (g) to "internationally recognized human rights" must comprise a residual body of protections and violations that, though articulated in global human rights declarations and instruments, standing alone presumably may not as yet have attained the authority of customary international law when considered as isolated incidences, but may rise to acquire such status when they satisfy the two specified standards: being both part of a "consistent pattern" and "gross" violations. In *Kadic*, the Second Circuit considered a somewhat analogous situation. It ruled that certain atrocities involving rape, torture and summary execution attributed · personally to the offender that ordinarily would require state action to qualify as violations of international law were cognizable under the ATCA without regard to state action insofar as they were committed in furtherance of misconduct, such as genocide or war crimes, that did constitute recognized *jus cogens* violations of international law for which private individuals may be held liable even absent state action.[98]

This reading and application would also be consistent with analogous federal law principles which hold that wrongful conduct by federal or municipal government

---

**95.** *See Restatement of Foreign Relations, supra* § 702; *id.* cmt. n and Reporters' Note 11.

**96.** *Id.* at § 702(g).

**97.** *Id.* cmt. m; *see also id.* Reporters' Note 10 (noting that " '[c]onsistent pattern of gross violations' generally refers to violations of

those rights that are universally accepted and that no government would admit to violating as state policy," including political and civil rights such as those described above).

**98.** 70 F.3d at 243–44; *accord Unocal,* 2002 WL 31063976, at *9, —— F.3d ——, ——.

officials is not actionable as violating certain constitutional prohibitions unless the underlying actions constitute a custom, policy or practice or, in the case of other constitutional standards, demonstrates conduct sufficiently gross to comprise reckless disregard or deliberate indifference for human life.[99]

Second, an interpretation of clause (g) that would define the violations it encompasses by reverting back to those already enumerated in clauses (a) through (f) would be tautological and render clause (g) meaningless. Third, the underlying concept of clause (g) is consistent with that of clause (f). Racial discrimination as such is universally denounced as incompatible with international norms.[100] But under § 702(f) racial discrimination, when practiced, encouraged or condoned by the state, violates international human rights law only when it is "systematic".[101]

Expressions of a concept similar to that embodied in Restatement § 702(g), articu-

lating international concern and condemnation of "gross and systematic" violations of fundamental human rights, are reflected in various international pronouncements.[102] As it pertains specifically to certain political rights, this principle is affirmed in the Proclamation of Teheran,[103] which declares that: "Gross denials of human rights arising from discrimination on grounds of race, religion, belief or expressions of opinion outrage the conscience of mankind and endanger the foundations of freedom, justice and peace in the world."

b. *The Civil and Political Rights Covenant*

The Civil and Political Rights Covenant does offer greater specific definition and guidance with regard to the freedoms here in question. It makes clear that even if perhaps not all of the civil and political rights enunciated in the Universal Declaration may garner global recognition satisfying the requisite standards of uni-

**99.** *See Farmer v. Brennan,* 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Monell v. Dep't Soc. Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Bivens v. Six Unknown Named Agents of Fed. Bur. of Narcotics,* 403 U.S. 388, 393, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) ("An agent acting—albeit unconstitutionally—in the name of the United States possesses far greater capacity for harm than an individual trespasser exercising no authority other than his own."); *see also Unocal,* 2002 WL 31063976, at *34, —— F.3d ——, —— (Reinhardt, J., concurring).

**100.** *See, e.g.,* Universal Declaration, *supra,* Arts. 2, 7, *reprinted in International Instruments, supra,* Vol. I, Pt. 1, at 2–3; Convention on Racial Discrimination, *supra,* Arts. 1–8. *reprinted in International Instruments, supra,* Vol. I, Pt. 1, at 66–71.

**101.** *Restatement of Foreign Relations, supra* § 702(g).

**102.** *See e.g.,* Vienna Declaration and Programme of Action (the "Vienna Declaration"), ¶ 80, U.N. Doc. A/CONF. 157/23 (1993) (expressing condemnation of various "gross and

systematic violations and situations that constitute serious obstacles to the full enjoyment of all human rights ..."); *Beijing Declaration and Platform for Action* (the "Beijing Declaration"), ch. IV.E. ¶¶ 114, 131, U.N. Doc. A/CONF. 177/20 (1995) (same, and specifically referencing "systematic rape"). The Vienna Declaration was adopted by the World Conference on Human Rights on June 25, 1993. *See* Vienna Declaration, *supra,* Note by the Secretarial. The Beijing Declaration was adopted by the Fourth World Conference on Women on September 15, 1995. *See* Beijing Declaration, *supra,* Resolution 1.

**103.** *See Proclamation of Teheran, Final Act of the International Conference on Human Rights* (the "Proclamation of Teheran"), ¶ 11, U.N. Doc. A/CONF. 32/41 at 3 (1968), *reprinted in International Instruments, supra,* Vol. I, Pt. 1, at 51–54. The Proclamation of Teheran was adopted by the International Conference on Human Rights at Teheran on May 13, 1968. *See International Instruments, supra,* Vol. I, Pt. 1, at 51.

versality and specificity, and thus qualify as customary international law, not all of the proclaimed rights necessarily stand on the same footing. In fact, the Covenant itself manifests that some universal human rights already have attained sufficient definition and recognition among the individual freedoms that are entitled to protection as peremptory norms. The listing includes proscriptions concerning: the right to life (Art. 6); freedom from torture (Art. 7) and slavery (Art. 8); imprisonment for debt (Art. 11); criminal convictions under *ex post facto* laws (Art. 15); and the right to recognition as a legal person (Art. 16).[104] Article 4(2) specifically enumerates the right to freedom of thought, conscience and religion enunciated in Article 18 among the provisions of the Covenant that are not subject to derogation in time of public emergency, and is thus accorded special rank among those standards that have acquired firm standing as customary international law.[105]

Moreover, Article 18(3) of the Covenant articulates specific standards clearly defining the scope of freedom of thought, conscience and religion and the circumstances under which interference with exercise of these rights may be permissible. In particular, no restraints are allowed on these freedoms as such; Article 18(3) of the Covenant recognizes limitations only on a person's freedom to manifest his religion or beliefs, and then only insofar as such restrictions "are prescribed by law and are necessary to protect public safety, order, health, or morals or the fundamental rights and freedoms of others." [106]

A very similar framework defining the bounds of restraints on exercise of the right to freedom of opinion and expression is contained in Article 19. First, Article 19(1) recognizes the right of every person to hold opinions without interference. The right is expressed in absolute terms, with no permitted infringements. Freedom of expression, on the other hand, is made subject to specific limitations, but only as provided by law and necessary (a) for respect of the reputations or rights of others, or (b) for the protection of national security, or of public order, or of public health or morals.[107]

So structured, freedoms of thought, conscience and religion, and the related freedoms of opinion and expression,[108] may be regarded as ordered on a higher plane on the scale of universal acceptance and defi-

104. See *International Instruments, supra,* Vol. I, Pt. 1 at 22, 23, 25, 27; *see also Restatement of Foreign Relations, supra* § 702, cmt. n.

105. See *International Instruments, supra,* Vol. I, Pt. 1 at 22.

106. *Id.* at 27; *see also* Karl Josef Partsch, *Freedom of Conscience and Expression, and Political Freedoms, published in The International Bill of Rights, supra* at 212.

107. See *International Instruments, supra,* Vol. I, Pt. 1, at 28. Article 19(3)(a) and (b) add respect for the reputations of others and protection of national security to the grounds permitting limitations on freedom of expression. These concerns are not mentioned in Article 18(3) as regards freedom of thought, conscience and religion. *See id.* at 27–28.

108. By placing freedom of thought and freedom of opinion in separate Articles, the Covenant seems to imply a distinction between them. Any difference is tenuous. For, "thought" may include not only religious belief but social and political conceptualization as well. *See The International Bill of Rights, supra* at 214. One commentator endeavored to describe the nuances as follows: "[T]here are no clear frontiers between 'thought', and 'opinion'; both are internal. 'Thought' is a process, while 'opinion' is the result of this process. 'Thought' may be nearer to religion' or other beliefs, 'opinion' nearer to political convictions. 'Thought' may be used in connection with faith or creed, 'opinion' for convictions in secular and civil matters." *Id.* at 217.

nition, and thus vested with a higher grade of protection, than associational and participatory rights such as freedom of association, assembly and political participation in government, each of which is subject to many more practical constraints associated with other public imperatives.[109]

On this point, the Preamble of the Universal Declaration itself eloquently affirms that "the advent of a world in which human beings shall enjoy freedom of speech and belief and freedom from fear and want has been proclaimed as the highest aspiration of the common people." [110] For, internal intrusions into the workings of the mind in formulating thought and opinion, and on their manifestations as beliefs and legitimate expression, may be inherently

more invasive and perverse, and thus may be more fundamentally harmful to the individual and society, than some external restraints affecting an individual's associational and participatory political rights.[111] The *Restatement of Foreign Relations* also implicitly acknowledges the special significance of the person's mental freedoms in its specific mention of denial of freedom of conscience among its illustrations of the violations of internationally recognized human rights that would fall within the proscription of § 702.[112]

Similar recognition of the unique value, and the priority among human rights norms, vested by the Civil and Political Rights Covenant in freedom of conscience, thought, opinion and expression is also

**109.** As regards the rights of peaceful assembly, of association with others, and of participation in political affairs, Articles 21, 22 and 25 of the Covenant elaborate other qualifications that clearly manifest the hierarchy of the arrangement among these various civil and political rights. *See International Instruments, supra*, Vol. I, Pt. 1, at 28–20. As in Articles 18 and 19, limitations are placed by Articles 21 and 22 on exercise of the rights of peaceful assembly and association; any interference is subject to the condition that the restriction be "necessary" in connection with the specified public purposes. Articles 18 and 19, however, require that any limitation on freedom to manifest beliefs or religion, as well as exercise freedom of expression, must be necessary to "protect" public safety, order, health or morals. *Id.* at 27–28. Articles 21 and 22, on the other hand, provide that the interference must be necessary "in a democratic society" and "in the interests" of national security or public safety or public order. Moreover, Article 21 differs in that restrictions are permitted if "imposed in conformity with law," as opposed to the apparently stricter standard of "prescribed" or "provided" by law that is employed in other formulations of the limitation. *Id.* at 28. These modifications would have the effect of rendering the recognition of freedoms associated with manifestation of beliefs and expression more rigorous as well as more broadly based.

By way of further contrast evidencing the distinctions and priorities built into the Covenant's hierarchical order, the rights of participation in political affairs set forth in Article 25 are not subject to the strict standards reflected in the "prescribed" or "provided" by law and "necessary" formulations that apply to the rights contained in Articles 18, 19, 21 and 22. Rather, these participatory rights are qualified by a far more ample and flexible condition that any restriction on them not be "unreasonable." *Id.* at 29–30.

**110.** *International Instruments, supra*, Vol. I, Pt. 1 at 1.

**111.** *See* Civil and Political Rights Covenant, *supra*, Arts. 19, 21, 22, 25 *International Instruments, supra*, Vol. I, Pt. 1 at 28–30 (categorically delineating a "right to hold opinions without interference" while providing for "reasonable" and "necessary" restrictions on rights to freedom of peaceful assembly, association and public governance and election); *see also International Bill of Rights, supra* at 217 ("The right to hold opinions may be seen as a special aspect of the right of privacy dealt with in Article 17 [of the Covenant], but there only arbitrary and unlawful interferences are prohibited; the privacy of thought and opinion is subject to no interference whatever.").

**112.** *See Restatement of Foreign Relations, supra* § 702, cmt. m.

conveyed in other authoritative sources and scholarly views. The Supreme Court has described freedom of opinion and expression as "the matrix, the indispensable condition of nearly every other form of freedom."[113] These freedoms have also been characterized as "the 'touchstone of all the freedoms to which the United Nations is consecrated.'"[114]

Article 2 of the Universal Declaration embodies this recognition by placing enjoyment of rights and freedoms without discrimination based on "political or other opinions" on par with other impermissible distinctions, such as race, color, sex, language, religion and national or social origin.[115] This provision is reinforced by the affirmative prescriptions set forth in Article 7, which recognize every person's right to equal protection of the law against any form of discrimination or incitement to discrimination, and in Article 19, which specifically enunciates the "right to freedom of opinion and expression," including "freedom to hold opinions without interference . . . ."[116]

These longstanding, consistent, widely recognized expressions uniformly convey a basic principle that "[t]he differential treatment of individual human beings en-

tirely on the basis of political and other opinions is clearly incompatible with the values of human dignity."[117] Beyond its political and moral grounding, this precept also possesses other utilitarian value insofar as "abundant production and wide sharing of all values are profoundly affected by the degree to which the members of a community enjoy freedom of opinion."[118]

### c. *Recognition by Courts and Other Adjudicatory Bodies*

The level of the recognition and definition accorded to the rights to freedom of thought and beliefs and of opinion and expression as binding international norms is reflected in official interpretations and applications of the relevant provisions of the Civil and Political Rights Covenant by various international courts and adjudicatory bodies. These authorities uniformly reaffirm three essential principles that define and embody the specific content of these rights: (1) that the right to enjoy and exercise these freedoms is a fundamental and obligatory international norm; (2) that any interference with the exercise of these rights may be justified only (a) when provided by law, (b) when the restraint is necessary to protect essential rights of others or to further vital public

---

**113.** *Palko v. Connecticut*, 302 U.S. 319, 327, 58 S.Ct. 149, 82 L.Ed. 288 (1937).

**114.** McDougal, Lasswell and Chen, *supra* at 700–01 (quoting *Annotations on the Text of the Draft International Covenants on Human Rights*, 10 U.N. GAOR, Annexes (Agenda Item No. 28) at 50, U.N. Doc A/2929 (1955)). *See also The International Bill of Rights, supra* at 216 ("It is an old commonplace that freedom of opinion and expression is one of the cornerstones of human rights and has great importance for all other rights and freedoms.").

**115.** *See International Instruments, supra*, Vol. I, Pt. 1 at 2.

**116.** Universal Declaration, *supra*, Art. 19, *reprinted in International Instruments, supra*, Vol. 1, Pt. 1, at 4; *see also* Civil and Political

Rights Covenant, *supra*, Arts. 2(1), 26, *reprinted in International Instruments, supra*, Vol. I, Pt. 1, at 21, 26; African Charter, *supra*, Art. 2, *reprinted in International Instruments, supra*, Vol. II at 331; American Convention, *supra*, Art. 13, *reprinted in International Instruments, supra*, Vol. II at 19; European Convention, *supra*, Art. 14, *reprinted in International Instruments, supra*, Vol. II at 78; Proclamation of Teheran, *supra* ¶ 5, *reprinted in International Instruments, supra*, Vol. I, Pt. 1 at 52.

**117.** McDougal, Lasswell and Chen, *supra* at 697.

**118.** *Id.* at 697–98.

purposes grounded on national security, public order, safety, health or morals, and (c) when the interference is proportionate to the legitimate aims pursued; and (3) that violation of these standards is actionable and compensable in damages to the victims.

These principles emerge from rulings rendered by the United Nation's Human Rights Committee in the course of carrying out its adjudicatory role under the *Optional Protocol to the Civil and Political Rights Covenant* (the "Optional Protocol").[119] These authoritative interpretations and applications of the Covenant reflect an index of the scope of the global community's recognition and acceptance of the principles of the Covenant in this regard as obligatory. In *Aduayom v. Togo*,[120] for example, the Human Rights Committee considered a claim under Article 19 of the Civil and Political Rights Covenant brought by a group of authors who were arrested and suspended from their public employment for various political offenses, including possession of pamphlets and other documents critical of the government of Togo and outlining the organization of a new political party. The Committee determined that the Togo government's refusal to reinstate the claimants to their jobs and compensate for lost wages constituted a violation of Article 19's right to freedom of political opinion and expression for which the state had provided no justification pursuant to any of the exceptions recognized under Article 19(3). In so ruling, the Committee observed that:

> the freedom of information and expression are cornerstones in any free and democratic society. It is on the essence of such societies that its citizens must be allowed to inform themselves about alternatives to the political system/parties in power, and that they may criticize or openly and publicly evaluate their governments without fear of interference or punishment, within the limits set by [A]rt. 19(3).[121]

Decisions in a similar vein construing the freedom of conscience, opinion and expression provisions of the European Convention,[122] which parallel those of the Civil

---

**119.** *See* G.A. Res. 2200 A(XXI), U.N. Doc. A/6316 (1966), *reprinted in International Instruments, supra,* Vol. I, Pt. 1, at 44–45. As of August 21, 2002, of the 156 state signatories of the Civil and Political Rights Covenant, 107 had signed and 102 had acceded to the Optional Protocol. *See Status of Ratifications of the Principal International Human Rights Treaties,* at *http://www.unhchr.ch/pdf/report.pdf* (August 21, 2002).

**120.** 1 B.H.R.C. 653 (1996).

**121.** *Id.* at ¶ 7.4; *see also Ross v. Canada,* 10 B.H.R.C. 219, ¶¶ 11.1–11.6 (U.N. H.R. Cmtee 2000) (finding no violation of Article 19 of the Covenant where the state demonstrated that the challenged interference with freedom of expression satisfied the standards set forth in Article 19(3), in that the restriction was imposed by law and did not go farther than necessary to achieve a legitimate protective function); *Faurisson v. France,* 2 B.H.R.C. 1, ¶¶ 9.1—10 (1996) (same); *HKSAR v. Ng Kung Siu,* 6 B.H.R.C. 591 (Hong Kong Ct.App. 1999) (finding a violation of Article 19(3) in the conviction of a defendant under a national flag ordinance for defacing a flag during a peaceful demonstration).

**122.** Article 10 of the European Convention provides:

> 1. Everyone has the right to freedom of expression. This right shall include freedom to hold opinions and to receive and impart information and ideas without interference by public authority and regardless of frontiers. This Article shall not prevent States from requiring the licensing of broadcasting, television or cinema enterprises.
> 2. The exercise of these freedoms, since it carries with it duties and responsibilities, may be subject to such formalities, conditions, restrictions or penalties as are prescribed by law and are necessary in a dem-

and Political Rights Covenant, have been rendered by the European Court of Human Rights, as well as by some national courts. In *Surek v. Turkey*,[123] the European Court found a violation of Article 10 of the European Convention in the conviction and sentencing of two journalists for publication of interviews with the leader of a Turkish separatist organization that was declared illegal under national law, where there was no evidence that the political opinions expressed in the interviews could be construed as incitement to violence and the state action could not otherwise be justified as necessary under the exceptions of Article 10(2) of the Convention, a provision the court noted must be strictly construed.[124] Among the essential premises the court reaffirmed in its determination, which awarded compensatory damages to the claimants, was that freedom of expression constitutes "one of the basic conditions ... for each individual's self-fulfillment."[125]

It follows from the interpretation and application given by these international bodies and national courts to the exercise of freedom of political opinion and expression that if the state violates the right when it employs its legal process to prosecute and punish individuals who profess

views at odds with the government's orthodoxy, it would contravene those fundamental human rights principles and ends even more readily in instances where the state resorts to utter violence and lawlessness as the means to commit the internationally proscribed offenses. Hence, a systematic campaign of terror and violence conceived and arbitrarily waged by state agents arising not from any legitimate response to a demonstrable need related to the protection of public order, health or safety or other imperative governmental purpose, but rather hatched and calculated to suppress political opinion and expression, is neither provided by law, necessary to safeguard other vital rights or public purposes, nor proportionate to any justifiable state aims pursued. When accompanied by extreme deprivations of life and liberty and unwarranted invasions of privacy as the instruments employed to achieve these repressive ends, the state's actions present unique dimensions that should qualify under a standard requiring a consistent pattern of gross violations of internationally recognized human rights.[126]

### d. *Application to the Case At Bar*

Here, the infringements committed by ZANU–PF of Plaintiffs' rights of freedoms

---

ocratic society, in the interests of national security, territorial integrity or public safety, for the prevention of disorder or crime, for the protection of health or morals, for the protection of the reputation or rights of others, for preventing the disclosure of information received in confidence, or for maintaining the authority and impartiality of the judiciary.
*International Instruments*, *supra*, Vol. II at 77.

**123.** 7 B.H.R.C. 339, ¶¶ 57–64 (Eur.Ct.H.R.1999).

**124.** *Id.* ¶ 57.

**125.** *Id.; see also Redmond–Bate v. Dir. of Pub. Prosecutions*, 7 B.H.R.C. 375, ¶ 20 (High Ct., Qns. Bench 1999) (same).

**126.** The United States Foreign Assistance Act of 1961 bars assistance to the government of "any country which engages in a consistent pattern of gross violations of internationally recognized human rights, including torture or cruel, inhuman, or degrading treatment or punishment, prolonged detention without charges, causing the disappearance of persons by the abduction and clandestine detention of those persons, or other flagrant denial of the right to life, liberty, and the security of person ...." 22 U.S.C. § 2151n(a). *See also* 22 U.S.C. § 2304; International Financial Assistance Act of 1977, 22 U.S.C. § 262d (expressing United States policy to oppose assistance to such governments by international financial institutions).

of political belief, opinion and expression were sufficiently systematic and gross to warrant a finding of a violation of international law and corresponding liability, as well as an award of consequential damages under the ATCA in accordance with the Magistrate Judge's recommendations in this case.

 Undoubtedly, states may differ on the general content of certain political freedoms and the depth of their commitment to protect them. Their practices may vary as to the scope of the state's obligations to initiate defined measures to ensure meaningful exercise by their nationals of political rights universally recognized. And while nations may concede certain wrongful human rights practices as culpable excesses, or deny the existence of alleged violations of certain individual freedoms as grounded on legitimate political particularities of sovereign states, or as not supported by pertinent facts, few would justify or defend by legally supportable reasons that, as a matter of domestic or international law, a sufficient mandate exists for a state, as a means of advancing valid public purposes, to engage in an affirmative campaign of systematic harassment, egregious organized violence and terror, and arbitrary invasions of individual life, liberty and privacy specifically intended to deprive its people of freedoms of political thought, conscience, opinion and expression. This standard should govern especially where, as here, these rights are professedly recognized by the state's own organic law and avowed by the state as universal norms it has pledged to confer, honor and protect.[127]

It is true that under certain exigencies threatening safety, security or public order, the state may justifiably impose reasonable restraints on the exercise of these freedoms.[128] Article 19(3) of the Civil and Political Rights Covenant expressly recognizes that exercise of freedom of expression is subject to restrictions. But the exception, strictly construed by the authorities that have ruled on it, are circumscribed by the limitations. There is no evidence in this case of the existence of any public emergency officially proclaimed, or any necessity of national security or public order, that may have presented even colorable grounds to justify the state's actions as a warranted derogation from its obligations to ensure Plaintiffs' rights.[129]

Another consideration may weigh in the balance of gradations that may tip the measure of misconduct into the more severe scale deemed sufficiently gross or systematic for the purposes of assessing state violations of internationally recognized standards. In general, sovereign hypocrisy and cynicism, manifest in a state's failure to invest its domestic law and justice system with substance and force enough to enable its citizens meaningfully to exercise internationally recognized civil and political rights the state itself publicly embraces, may not suffice by itself to comprise a violation of universal norms. But hypocrisy exposed and materialized in the power of the state committed to organized brutality and violence inflicted against its own people and specifically calculated to deny political freedoms of conscience, opin-

127. Zimbabwe is a signatory of the United Nations Charter, the Civil and Political Rights Covenant and the African Charter. (Laue Aff., ¶ 15.)

128. See, e.g., Gitlow v. New York, 268 U.S. 652, 666–67, 45 S.Ct. 625, 69 L.Ed. 1138 (1925); Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919).

129. See Civil and Political Rights Covenant, supra, Arts. 4(1), 4(2) and 19(3), reprinted in International Instruments, supra, Vol. I, Pt. 1, at 22, 28.

ion and expression the state itself ostensibly has conferred, may be a different matter. For, when the state undertakes to give expression and force of law not to foster the protection of fundamental human rights it publicly proclaims, but rather to execute systematic denials of those freedoms, the action may cross over the imprecise line and assume the added dimension of virulence necessary to transgress into the domain of what qualifies as a pattern of gross violations of universal norms.

By affirmatively unleashing a consistent pattern of violence and terror upon people led to believe, by the state's own domestic and international pronouncements, that those rights were theirs to enjoy, naked cynicism then not only substantiates the state's public deception in not sufficiently safeguarding those human rights, but may compound a failure to act that by itself may not be cognizable under one measure of illegality into a fury of affirmative wrongs and injuries actionable under another. This consideration is similar, albeit in a different context, to the principle of the common law of torts that a state may not be held liable for taking no action to enact remedial measures to address a potentially harmful condition it has no duty to correct, but may be found responsible for injuries when its agents do interject themselves into the situation and undertake related actions in the course of which they do not exercise the requisite standard of care the circumstances demand.[130] In the final analysis, when a state not only so eviscerates its own duty to ensure fundamental domestic and internationally recognized human rights as to render them nothing more than a hollow formalism, but also itself intentionally perpetrates gross violations of those very rights, the resulting combination of harms crosses the threshold of individual protections prevailing under universally recognized human rights norms.

On the basis of the preceding considerations and analysis, the Court concludes that Plaintiffs have established a violation of an internationally recognized norm to a right of freedom of political beliefs, opinion and expression without arbitrary and unjustified interference by the state.

### e. *Zimbabwe Law*

The Court also notes that apart from the status of the political freedoms Plaintiffs assert under international law, these rights are also recognized under Zimbabwe law, although the scope of a municipal cause of action for monetary damages to vindicate these rights is somewhat ambiguous. The Zimbabwe Constitution contains explicit guarantees and prohibitions safeguarding freedoms of expression, of conscience, and of assembly and association.[131] Specifically, these rights are defined to proscribe that no person shall be hindered in the enjoyment of "freedom to hold opinions and to receive and impart ideas and information without interference," [132] as well as the "right to assemble freely and associate with other persons and in particular to form or belong to political parties ... or other associations for the protections of his interests." [133]

---

130. *See, e.g., Raucci v. Town of Rotterdam,* 902 F.2d 1050, 1055–56 (2d Cir.1990); *Sorichetti v. City of New York,* 65 N.Y.2d 461, 492 N.Y.S.2d 591, 482 N.E.2d 70, 74–75 (1985).

131. *See* Zimbabwe Const. Arts. 11, 20, 21; Laue Aff., ¶ 14.

132. Zimbabwe Const. Art. 20(1).

133. *Id.* Art. 21(1).

Under the foregoing provisions, a private action ordinarily does not exist to recover monetary compensation for violations of the specified rights, except that persons aggrieved by the unlawful conduct, including decedents' spouses and dependents, may be entitled to sue for damages where the wrong is also founded on a cause of action that falls within principles such as those comprising common law assault, torture or wrongful death.[134] The Court construes these provisions as sufficient to warrant a finding of liability and an award of compensatory damages to Plaintiffs with respect to ZANU–PF's violations of Zimbabwe law.[135]

As the Magistrate Judge determined here, an analogous basis for liability exists under federal law for violations of First Amendment rights, which include freedoms of speech, assembly, protest and association.[136] Insofar as the Court has determined that Plaintiffs' injuries resulted from violations of the law of nations also recognized under federal law, Plaintiffs are entitled to compensation under the ATCA.

On the basis of the foregoing authority, the Court adopts the Magistrate Judge's recommendation to award compensatory damages and punitive damages with regard to Plaintiffs' Claims Three and Four.

### 3. Cruel, Inhuman or Degrading Treatment

Plaintiff's Claim Five describes ZANU–PF's acts of cruel inhuman or degrading treatment. The Magistrate Judge recom-

mended an award of compensatory and punitive damages with respect to this claim. The wrongful conduct upon which the Magistrate Judge found liability, encompasses: [137]

- The suffering of Tapfuma Chiminya, Mathew Pfebve, and David Stevens, prior to their death, including being bound and gagged and forced to ride in a vehicle for hours, being dragged down the street in front of neighbors and loved ones, and being placed in fear of impending death;
- The suffering of Efridah Pfebve, who had watched her elderly mother being stoned by an angry mob, saw her brothers and elderly father being dragged down the street and beaten, and observed her home being ransacked; and
- The harms to Evelyn Masiti and Elliot Pfebve, who lived in constant threat of death by defendant and suffered repeated attacks upon their persons, families and property.

### a. International Law

Other courts which have considered the issue have expressed divergent views as to whether cruel, inhuman or degrading treatment, though broadly expressed and accepted in the abstract as an international norm, possesses the requisite elements of universality and specificity to constitute a recognized proscription under the customary law of nations. In *Forti v. Suarez–Mason*,[138] for example, the court

134. *See* Laue Aff., ¶ 14.

135. However, there is no indication in the materials presented to the Court as to whether punitive damages could be awarded under Zimbabwe law with regard to a violation of these political rights.

136. *See Tachiona III*, 216 F.Supp.2d at 280 (citing *Petramale v. Local No. 17 of Laborers*

*Int'l Union of N. Am.*, 847 F.2d 1009, 1013 (2d Cir.1988), and *Phillips v. Bowen*, 115 F.Supp.2d 303, 306 (N.D.N.Y.2000), aff'd, 278 F.3d 103 (2d Cir.2002)).

137. *See Tachiona III*, 216 F.Supp.2d at 281.

138. 694 F.Supp. 707, 711–12 (N.D.Cal.1988) ("*Forti II*").

sustained its earlier dismissal of a claim of cruel, inhuman or degrading treatment upon concluding that there was not a sufficiently universal consensus defining the content of the prohibited conduct as a distinct international tort so as to be actionable under the ATCA.

The *Xuncax* court, however, reached a different result.[139] The court did note that the prohibition against cruel, inhuman or degrading treatment poses more complex definitional problems than other recognized international norms. Nonetheless, the court concluded that "[i]t is not necessary for every aspect of what might comprise a standard... be fully defined and universally agreed before a given action meriting the label is clearly proscribed under international law...."[140] It then held that any conduct proscribed by the United States Constitution and by a cognizable principle of international law falls within the scope of cruel, inhuman or degrading treatment and is thus actionable under the ATCA.[141]

Other courts have expressed no reservations in accepting cruel, inhuman or de-grading treatment as a "discrete and well recognized violation of international law," and a separate ground for liability under the ATCA, at least insofar as the unlawful conduct in question would also violate the Fifth, Eighth and/or Fourteenth Amendments to the United States Constitution.[142]

Grounds for doubts as to the scope of consensus and definitional content of the prohibition against the cruel, inhuman or degrading treatment arise by reason of ambiguous evidence of what unlawful conduct falls within the ascertainable contours of the action, beyond the bounds of what is already accepted as encompassed by prohibitions of torture, summary execution and prolonged arbitrary detention.[143] The conceptual difficulties are compounded because while the experts concur as to the existence of the norm, they offer little analytic guidance helpful in charting its precise frontiers as distinct wrongful conduct.[144] Thus, while most international declarations and covenants that proscribe torture also extend by conjunction to cruel, inhuman or degrading treatment or punishment,[145] those instruments contain spe-

139. *See Xuncax*, 886 F.Supp. at 186–87.

140. *Id.* at 187.

141. *Id.*

142. *Jama v. United States Immigration and Nat. Serv.*, 22 F.Supp.2d 353, 363 (D.N.J. 1998); *Mehinovic*, 198 F.Supp.2d at 1347–48 (citing *Abebe–Jira*, 72 F.3d at 847; *Cabello v. Fernandez–Larios*, 157 F.Supp.2d 1345, 1362 (S.D.Fla.2001)).

143. *See Forti I*, 672 F.Supp. at 1543; *Xuncax*, 886 F.Supp. at 186.

144. *See Forti II*, 694 F.Supp. at 711–712.

145. *See, e.g.*, Universal Declaration, *supra*, Art. 5, *reprinted in International Instruments, supra*, Vol. I, Pt. 1, at 2 ("[N]o one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."); Declaration on the Protection of All Persons from *Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* (the "Torture Declaration"), Art. 1, G.A. Res. 3452, U.N. Doc. A/10034 (1975), *reprinted in International Instrument, supra*, Vol. I., Pt. 1, at 290 ("Any act of torture or other cruel, inhuman or degrading treatment or punishment is an offense to human dignity[.]"); Civil and Political Rights Covenant, *supra*, Art. 7, *reprinted in International Instruments, supra*, Vol. I, Pt. 1, at 23 ("No one shall be subjected to torture or to cruel, inhuman, or degrading treatment or punishment."); African Charter, *supra*, Art. 5, *reprinted in International Instruments, supra*, Vol. II at 332 (same); European Convention, *supra*, Art. 3, *reprinted in International Instruments, supra*, Vol. II at 74 (same); *Restatement of Foreign Relations, supra* § 702 (same).

In *Xuncax*, the court noted that the provisions of the Torture Convention relating to

cific definitions of torture but not of cruel, inhuman or degrading treatment.[146]

Despite the absence of a distinct definition for what constitutes cruel, inhuman or degrading treatment, various authorities and international instruments make clear that this prohibition is conceptually linked to torture by shades of misconduct discernible as a continuum. The gradations of the latter are marked only by the degrees of mistreatment the victim suffers, by the level of malice the offender exhibits and by evidence of any aggravating or mitigating considerations that may inform a reasonable application of a distinction. Several courts and other authorities have recognized that: "[g]enerally, cruel, inhuman or degrading treatment includes acts which inflict mental or physical suffering, humiliation, fear and debasement, which do not rise to the level of 'torture' or do not have the same purposes as 'torture'." [147]

That it may present difficulties to pinpoint precisely where on the spectrum of atrocities the shades of cruel, inhuman, or degrading treatment bleed into torture should not detract from what really goes to the essence of any uncertainty: that, distinctly classified or not, the infliction of cruel, inhuman or degrading treatment by agents of the state, as closely akin to or adjunct of torture, is universally condemned and renounced as offending internationally recognized norms of civilized conduct. Nor should the challenges of drawing distinctions deter from the task of supplying content drawn from real experience. It is well to recall that among the major sources of customary international law are judicial decisions rendered on the specific subject, rulings that may illuminate the meaning of particular standards, manifest guidance as to the course of the law and measure the breadth and strength of international consensus with regard to a given behavioral norm.

Like the growth of the common law, universally recognized norms ripen into settled law incrementally by the accretions of teachings informed by real events. Insofar as actual cases offer proper opportunities to resolve doubts and fill in gaps, the natural evolution of the law will be advanced by the authorized and principled exercise of judicial jurisdiction to decide them. Conversely, where uncertainty persists by dearth of precedent, declining to render decision that otherwise may help clarify or enlarge international practice, and thereby foster greater understanding and assent regarding the content of common behavioral rules, creates a self-fulfilling prophecy and retards the growth of customary international law. Accordingly, following the reasoning and guidance of the courts that have applied the standard,

---

torture are more explicit and forceful than those describing cruel, inhuman or degrading treatment. 886 F.Supp. at 186 n. 33. While that Convention defines "torture," it contains no explicit definition of cruel, inhuman or degrading treatment. Moreover Article 14 prescribes that every member state ensure in its legal system that victims of torture obtain redress and have an enforceable right to fair and adequate compensation. In contrast, Article 16 commits states only to undertake to prevent other acts of cruel, inhuman or degrading treatment that do not amount to torture. *See id.*

**146.** *See, e.g.,* Torture Declaration, *supra,* Art. 1, *reprinted in International Instruments, supra,* Vol. I, Pt. 1, at 293–94.

**147.** *Mehinovic,* 198 F.Supp.2d at 1348; *see also id.* (" '[T]orture is at the extreme end of cruel, inhuman or degrading treatment.' ") (quoting *Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment,* 101 Senate Exec. Rep. 30, at 13 (1990)); Torture Declaration, *supra,* Art. 1(2) *International Instruments, supra,* Vol. I, Pt. 1, at 290 ("Torture constitutes an aggravated and deliberate form of cruel, inhuman or degrading treatment or punishment.").

this Court finds that the unlawful conduct the Magistrate Judge described as grounds for liability and damages under Plaintiffs' Claim Five constitutes cruel, inhuman or degrading treatment prohibited under principles of international law.

Though clearly there are areas of overlap insofar as the more aggravated torture misconduct ordinarily would also encompass cruel, inhuman or degrading of treatment, there are also instructive differences that offer guidance as to some proper demarcations. As may have occurred in the instant case, a victim who has been tortured and dies from the assaults, and whose corpse is then dragged through the streets by the assailants, at that point is conceptually no longer himself personally a subject of torture or even cruelty. The notion of inflicting severe pain and suffering on the dead is a tautology. But life's veneration of life does not end at the grave; death does not extinguish organized society's reverence for human dignity or the law's recognition of all aspects of life's experience; nor does it diminish protection against life's degradation. Throughout the ages, in almost every culture, civilization has embodied rites with emblems and taboos signaling that the dignity of the human body is worthy of safeguards against desecration even after death. To that end, laws, customs and practices generally define separate classes of offenses whose focal wrong is not the conscious infliction of physical pain and suffering on the living, but the hurt perpetrated upon the living by the defiling of the dead.[148]

By any measure of decency, the public dragging of a lifeless body, especially in front of the victim's own home, for close kin and neighbors to behold the gruesome spectacle, would rank as a degradation and mean affront to human dignity. By the same token, the relatives necessarily made to bear witness to the torture and degradation of their kin, or the ransacking of their common property, are technically not themselves victims of torture. Few would quarrel, however, that the offenders' lawlessness would cause these individuals themselves to suffer the severe emotional pain and indignities associated with forms of cruelty and inhuman treatment. Thus, wherever the nuances of conduct may blend at the frontiers that define the limits of cruel, inhuman or degrading treatment, this Court has no hesitation finding that the wrongs committed by ZANU–PF in this case fall well within the realm of the execrable—unlawful conduct that would be condemned and rejected as contravening well-established and universally recognized norms of international law.

b. *Zimbabwe Law*

 Zimbabwe law also contains prohibitions against cruel, inhuman or degrading treatment. Specifically, the Zimbabwe Constitution provides that "no person shall be subjected to torture or to inhuman or degrading punishment or other such treatment." [149] It is not clear from the Zimbabwe law presented to the Court whether, behind this general proscription, Zimbabwe law recognizes a distinct, clearly de-

---

**148.** *See, e.g.,* Restatement (Second) of Torts: Interference with Dead Bodies § 868 (1982) (defining a cause of action for interference with dead bodies); Model Penal Code § 250.10 (Proposed Official Draft 1962) (making treatment of a corpse in a way that would "outrage ordinary family sensibilities" a misdemeanor); Criminal Code, R.S.C., ch. C–46, § 182 (1985) (Can.) (criminal law provi-

sion protecting the dignity of a corpse); *see also* Tyler Trent Ochoa, and Christina Newman Jones, *Defiling the Dead: Necrophilia and the Law,* 18 Whittier L.Rev. 539, 542–543 ("All societies for which there is any record have had customs concerning respect for corpses and the treatment of the bodies of the dead.").

**149.** *See* Zimbabwe Const. Art. 15(1).

fined private cause of action encompassing cruel, inhuman and degrading treatment. Some of the wrongs Plaintiffs charge under this claim, however, describe unlawful conduct that clearly would fall within the scope of assaults entailing homicide, injury to persons, destruction or damage to property. Such claims would be compensable under principles of Zimbabwe common law.[150]

Moreover, whether or not such injuries, inflicted by state agents or under the color of law, would state cognizable rights of action under Zimbabwe law, there can be no dispute that the actions describe violations other courts have found to fall within the proscriptions of the Fifth, Eighth and Fourteenth Amendments of the United States Constitution.[151] The dimension the offenses involved in these cases have in common include the wanton infliction of mental or physical suffering or assaults that manifest callous disregard for human dignity committed by the state or its agents through sustained, systematic and deliberate conduct engaged in the service of no legitimate public purpose.

### 4. Racial Discrimination and Unlawful Seizure of Property

With regard to Plaintiffs' Claims Six and Seven, the Magistrate Judge recommended an award of compensatory and punitive damages to Maria and David Stevens for the racial violence and terror they suffered through ZANU–PF unlawful conduct, and for damages caused by the Zimbabwe government's racially motivated confiscation of their farm, home and possessions motivated by racial animus. With respect to these claims, this Court found no basis to recognize that a taking of property by a sovereign state from its own citizens, as asserted here, constitutes a violation of well-established, universal norms of international law.[152] The Court left open the theoretical possibility of exercising pendent jurisdiction over the claim, but expressed reluctance to do so given the absence of a proof of relevant Zimbabwe municipal law to provide a grounds for such a remedy.

### a. Racial Discrimination

■ Systematic racial discrimination and racially-motivated violence, especially where practiced as a matter of state policy, is proscribed as violations of international standards in various international instruments.[153] Plaintiffs' claims of such misconduct are also closely analogous to contraventions of well-established princi-

**150.** See Laue Aff., ¶¶ 11–13.

**151.** In the United States' ratification of the Civil and Political Rights Covenant the Senate expressed a reservation to Article 7, which relates to torture and cruel, inhuman or degrading treatment or punishment. It provides that "Art. 7 protections shall not extend beyond protections of the 5th, 8th and 14th Amendments of the U.S. Constitution." Senate Comm. on Foreign Relations Report on the International Covenant on Civil and Political Rights, S. Exec. Report. No. 23, 102nd Cong., 2d Sess. (1992), reprinted in 31 I.L.M. 645, 646 (1992). See Mehinovic, 198 F.Supp.2d at 1347–48; Cabello, 157 F.Supp.2d at 1360; Jama, 22 F.Supp.2d at 363; Xuncax, 886 F.Supp. at 187.

**152.** See Tachiona III, 216 F.Supp.2d at 267.

**153.** See, e.g., Universal Declaration, supra, Arts. 2, 7, reprinted in International Instruments, supra, Vol. I, Pt. 1, at 2, 3. These provisions declare in pertinent part:

Art. 2:
Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.
Art. 7:
All are equal before the law and are entitled without discrimination to equal protection of the law. All are entitled to equal protection against any discrimination in violation

ples embodied in the Fourteenth Amendment of the United States Constitution and related federal civil rights statutes making such violations actionable.[154]

Plaintiffs have submitted evidence to establish that the Zimbabwe Constitution and other laws guarantee fundamental individual rights regardless of race, origins, color, creed or sex, and prohibits all forms of discrimination on these grounds.[155]

### b. *Seizure of Property*

█ The Zimbabwe Constitution forbids the state's seizure, damage or destruction of property without fair compensation.[156] Plaintiffs cite no authority, however, to support a determination that the state seizure of property of its own nationals without fair compensation described in Claim Seven constitutes a violation of well-defined, universal and obligatory norms of international conduct. It is true that the Universal Declaration, Art. 17, contains references the right to own

property and not be arbitrarily deprived of it.[157] However, no corresponding right was included in the Civil and Political Rights Covenant, an omission that diminishes any claim to universal consensus concerning the status of this right as customary international law.

The Court has found no other persuasive evidence that universal consensus exists recognizing contravention of this principle as customary international law and defining the boundaries of the offenses with sufficient specificity. To the contrary, the case law that exists has rejected such a claim. In *Dreyfus v. Von Finck*,[158] the Second Circuit held that a state's seizure of the property of its nationals, even if racially motivated, was not a violation of the law of nations. Insofar as Plaintiffs assert that the invasions and unlawful takings of property for which ZANU–PF were racially-inspired, such misconduct is encompassed within the actions the Court

---

of this Declaration and against any incitement to such discrimination.
*Id.; see also* Civil and Political Rights Covenant, *supra,* Arts. 2, 4(1), 26, *reprinted in International Instruments, supra,* Vol. I, Pt. 1, at 22, 23, 30; African Charter, *supra,* Arts. 2, 3, 4, 5, *reprinted in International Instruments, supra,* Vol. II at 331, 332; *International Convention on the Elimination of All Forms of Racial Discrimination, adopted* Dec. 21, 1965, Arts. 2, 3, 4, 5, 660 U.N.T.S. 195, 5 I.L.M. 352 (1966), *reprinted in International Instruments, supra,* Vol. I, Pt. 1, at 68–71; *Convention on the Prevention and Punishment of the Crime of Genocide,* 78 U.N.T.S. 277 (1951), *reprinted in International Instruments, supra,* Vol. I, Pt. 2, at 669; *International Convention on the Suppression and Punishment of the Crime of Apartheid,* Arts. II, III, IV, G.A. Res. 3068, 28 U.N. GAOR, Supp. 30, U.N. Doc. A/9030 (1973), *reprinted in International Instruments, supra,* Vol. I, Pt. 1, at 82–83; *Restatement of Foreign Relations, supra* § 702(e).

**154.** *See* 42 U.S.C. § 1983; *Johnson v. Smith,* 890 F.Supp. 726, 728–29 (N.D.Ill.1995).

**155.** *See* Zimbabwe Const. Arts. 11, 23; Laue Aff., ¶¶ 14, 15.

**156.** *See* Zimbabwe Const. Art. 16; Laue Aff., ¶ 12(iii).

**157.** *See International Instruments,* Vol. I, Pt. 1, at 4.

**158.** 534 F.2d 24, 30 (2d Cir.1976), *cert. denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976); *see also Jafari v. Islamic Republic of Iran,* 539 F.Supp. 209, 214–15 (N.D.Ill. 1982) (holding that the expropriation by a state of property of its own nationals does not contravene the law of nations); *Restatement of Foreign Relations, supra* § 702 cmt. k (noting that "[t]here is ... wide disagreement among states as to the scope and content of that right, which weighs against the conclusion that a human right to property generally has become a principle of customary law."); *see also Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 428–30, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (noting the wide divergence of authority as to international limitations on a state's taking of alien property).

sustained as recognized violations of international law under Claim Six.

▮▮▮ Nonetheless, Plaintiffs' complaint invoked the Court's pendent jurisdiction under 28 U.S.C. § 1367 and asserted claims under Zimbabwe law.[159] The Court therefore will exercise its discretion to assert authority over those claims. Having examined the provisions of the Zimbabwe Constitution and related law called to its attention, the Court is satisfied that Plaintiffs have asserted rights and cognizable actions under Zimbabwe law that would entitle them to the compensatory damages recommended by the Magistrate Judge with respect to Claim Seven.

▮▮▮ In connection with Claims Six and Seven, Plaintiffs made a general request for punitive damages, unlike the specific request they asserted with regard to their other five claims. However, because there is no evidence on the record to support a finding that Zimbabwe law would authorize the awarding of punitive damages in connection with unlawful seizure of property, the Court does not accept the portion of the Report that recommends Plaintiffs' recovery of exemplary damages with regard to Claim Seven.

## III. CONCLUSION

The Court adopts the Magistrate Judge's recommendation, as modified above, that Plaintiffs be awarded compensatory and punitive damages as follows:

A. CLAIMS ONE AND TWO:

 1. Extrajudicial Killing

| | Compensatory | Punitive |
| --- | --- | --- |
| Estate of Tapfuma Chiminya | $ 2,500,000 | $ 5,000,000 |
| Estate of Metthew Pfebve | $ 2,500,000 | $ 5,000,000 |
| Estate of David Stevens | $ 2,500,000 | $ 5,000,000 |

 2. Torture

| | | |
| --- | --- | --- |
| Estate of Metthew Pfebve | $ 1,000,000 | $ 5,000,000 |
| Estate of David Stevens | $ 1,000,000 | $ 5,000,000 |

B. CLAIMS THREE AND FOUR:

 1. Loss of Enjoyment of Political Rights

| | | |
| --- | --- | --- |
| Adella Chiminya | $ 500,000 | $ 1,000,000 |
| Efridah Pfebve | $ 500,000 | $ 1,000,000 |
| Elliott Pfebve | $ 1,000,000 | $ 2,000,000 |
| Evelyn Masaiti | $ 1,000,000 | $ 2,000,000 |

 2. Loss of Property

| | | |
| --- | --- | --- |
| Efrideh Pfebve | $ 230,909 | |

C. CLAIM FIVE

 Cruel, Inhuman or Degrading Treatment

159. *See* Compl. ¶¶ 7, 210.

| | | |
|---|---|---|
| Estate of Tapfuma Chiminya | $ 1,000,000 | $ 4,000,000 |
| Estate of Metthew Pfebve | $ 1,000,000 | $ 4,000,000 |
| Estate of David Stevens | $ 1,000,000 | $ 4,000,000 |
| Efridah Pfebve | $ 1,000,000 | $3,000,000 |
| Evelyn Masaiti | $ 750,000 | $ 1,500,000 |
| Elliott Pfebve | $ 750,000 | $ 1,500,000 |

## D. CLAIMS SIX AND SEVEN

### 1. Systematic Racial Discrimination

| | | |
|---|---|---|
| Estate of David Stevens | $ 500,000 | $ 1,000,000 |
| Maria Stevens | $ 500,000 | $ 1,000,000 |

### 2. Loss of Home, Destruction of Business and Seizure of Property

| | | |
|---|---|---|
| Maria Stevens | $ 1,000,000 | |
| Evelyn Masaiti | $ 19,544 | |

| | | |
|---|---|---|
| TOTAL | $20,250,453 | $51,000,000 |

## IV. ORDER

For the foregoing reasons, subject to the modifications discussed above, the Court adopts the Report and Recommendation of Magistrate Judge James Francis, dated July 1, 2002. Accordingly, it is hereby

ORDERED that Judgment be entered in favor of Plaintiffs and against defendant ZANU–PF in a total amount of $71,250,453.00 representing compensatory damages of $20,250,453.00 and punitive damages of $51,000,000.00 in accordance with the apportionment set forth above in the Conclusion section of this Decision and Order.

The Clerk of Court is directed to close this case.

SO ORDERED.